*Decision will be entered under Rule 50.*

TRIANON HOTEL COMPANY, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60338, 60339, 60341, 63700. Filed April 30, 1958.

*Joseph A. Hoskins, Esq., Jay O. Kramer, Esq.,* and *Harlow B. King, Esq.,* for the petitioners.

*Marvin E. Hagen, Esq.,* for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: Barney L. Allis, Docket No. 60339; Herbert M. Woolf, Docket No. 60341; Estate of Meyer B. Shanberg, Docket No. 63700.

In Docket No. 60338, Trianon Hotel Company, the Commissioner determined for the taxable year 1952, deficiencies in income tax and excess profits tax in the total amount of $210,602.94. The Commissioner has made claim under section 272 (e), 1939 Code, for increase in the deficiency, the amount to be computed under Rule 50.

The chief issue in Docket No. 60338 is the basis to Trianon Hotel Company, for purposes of depreciation, amortization, and sale or other disposition, of the assets it acquired through the liquidation of the Allis Hotel Corporation whose stock was acquired by Trianon Hotel Company.

In Docket Nos. 60339, 60341, and 63700, the Commissioner determined deficiencies in income tax for the taxable years and in the amounts set forth below:

| Docket No. | Petitioner | Years | Deficiencies |
|---|---|---|---|
| 60339 | Barney L. Allis | 1950 | $674,530.46 |
| 60341 | Herbert M. Woolf | 1947 | 51,293.75 |
|  |  | 1948 | 23,371.30 |
|  |  | 1949 | 28,104.10 |
|  |  | 1950 | 260,381.78 |
|  |  | 1953 | 34,167.80 |
| 63700 | Estate of Meyer Shanberg | 1950 | 300,107.84 |

In the cases of the above individual petitioners the main issue is whether in a transaction under which each sold, in 1950, shares of the common stock of the Allis Hotel Corporation to Trianon Hotel Company, the proceeds of the sales constituted dividends taxable as ordinary income, as the Commissioner determined, or long-term capital gain.

In Docket No. 60341, Herbert M. Woolf, all issues with respect to the years 1947, 1948, 1949, and 1953 have been settled by agreement of the parties, which agreement also disposes of one of the adjustments for 1950 which was made by the Commissioner. The remaining issue, therefore, involves only the taxable year 1950.

FINDINGS OF FACT.

Barney L. Allis and Herbert M. Woolf are residents of Kansas City, Missouri. They filed their respective individual returns for the taxable years with the collector of internal revenue for the sixth district of Missouri.

Meyer B. Shanberg was a resident of Miami Beach, Florida, during 1950. He filed a joint return for 1950 with the collector of internal revenue for the district of Florida. Meyer B. Shanberg died May 12, 1953. He was survived by his wife, now Pauline Shanberg Behrman, who is an executrix of his estate together with Chemical Corn Exchange Bank.

Trianon Hotel Company, hereinafter referred to as Trianon, is a corporation which maintains its principal office in Kansas City, Missouri. Its income tax return for the year 1952 was filed with the collector of internal revenue for the sixth district of Missouri.

In 1930, a group of investors, who were stockholders in Progressive Building Company, constructed the Allis Hotel in Wichita, Kansas. Barney L. Allis organized the Allis Hotel Corporation (hereinafter called Allis Corporation) under the laws of Kansas on May 28, 1930. Thereafter, in 1931, Progressive Building Company leased the hotel property to Allis Corporation which operated the hotel. Upon the expiration of the lease in 1937, the Allis Corporation purchased the hotel property from Progressive Building Company, and it continued to own and operate the hotel until the transaction which is involved here.

Barney Allis (hereinafter called Allis) and Meyer Shanberg (hereinafter called Shanberg) were officers and directors of Allis Corporation at all times, and Herbert Woolf (hereinafter called Woolf) was a member of the board of directors in 1930, 1931, and during the years 1934–1951. Under circumstances which are described hereinafter, Allis Corporation was liquidated and dissolved on December 31, 1951. Allis was president of Allis Corporation, and a member of its board of directors from the time of its organization until its dissolution, and he was also treasurer during the periods 1930–1940 and 1948–1951. Shanberg was treasurer during the years 1941–1947, and he was a member of the board of directors during the years 1930, 1931, and 1934 through 1939.

The authorized capital stock of the Allis Corporation consisted of 2,500 shares of preferred stock having a par value of $100 per share, and 7,500 shares of no-par common stock. All of the preferred stock was retired in 1939. The common stock was carried on the books at a value of $1 per share, at all times.

As of December 31, 1930, there were 1,765 shares of preferred stock of Allis Corporation outstanding, and there were 6,991¾ shares of common stock outstanding.

Allis Hotel Company, which had no connection with Allis Hotel Corporation and is not involved in these cases, owned 611¾ shares of the preferred stock of Allis Corporation; Shanberg owned 550 shares; Woolf owned 350 shares; W. R. LeClerc owned 100 shares; Charles S. Allis owned 53¼ shares; and Arthur Miller and F. H. Reid each owned 50 shares. As of December 31, 1938, there were 1,375 shares of preferred stock outstanding which were owned as follows: Barney L. Allis owned $468^{6325}/_{7100}$ shares; Edward Shanberg owned $2327^{00}/_{1775}$ shares; Woolf and Pauline Shanberg each owned $193^{1175}/_{1775}$ shares;

W. R. LeClerc owned $77\frac{825}{1775}$ shares; Charles S. Allis owned $461\frac{775}{100}$ shares; Edna Liebman, Gertrude Lighton, Arthur Miller, and F. H. Reid each owned $38\frac{1300}{1775}$ shares; and H. C. Nanson, Jr. owned $7\frac{1325}{1775}$.

As of December 31, 1930, the outstanding common stock, $6,991\frac{3}{4}$ shares, were held as follows: Allis Hotel Company owned 3,821 shares; Meyer Shanberg owned 1,455 shares; Woolf owned $1,018\frac{1}{2}$ shares; W. C. LeClerc owned 291 shares; Charles S. Allis owned 154 shares; Arthur Miller owned $145\frac{1}{2}$ shares; H. Simon owned $72\frac{3}{4}$ shares; H. C. Nanson owned 25 shares; and Barney Allis, Earl Evans, G. A. Laws, F. H. Reid, and H. L. Weaver each owned 1 share. In 1931, the outstanding common stock increased to 7,209 shares, which were the number of shares of common stock outstanding throughout the succeeding years until the end of 1951. The outstanding common stock as of December 31, 1931, December 31, 1941, December 31, 1943, and December 31, 1949, and December 31, 1950, was held in the amounts and by the stockholders shown in the following schedule. Under circumstances which are set forth hereinafter, Trianon Hotel Company purchased 7,209 shares of common stock which it held until Allis Corporation was dissolved on December 31, 1951.

ALLIS HOTEL CORPORATION OUTSTANDING COMMON STOCK

| Stockholders | December 31 | | | | |
|---|---|---|---|---|---|
| | 1931 | 1941 | 1943 | 1949 | 1950 |
| Allis Hotel Co | 3,821 | | | | |
| M. B. Shanberg | $1,600\frac{1}{2}$ | $1,600\frac{1}{2}$ | $1,600\frac{1}{2}$ | $1,600\frac{1}{2}$ | |
| H. M. Woolf | $727\frac{1}{2}$ | $727\frac{1}{2}$ | $727\frac{1}{2}$ | $727\frac{1}{2}$ | |
| W. C. LeClerc | 291 | 291 | 291 | | |
| Caroline LeClerc | | | | 291 | |
| Chas. S. Allis | 154 | 154 | 154 | 154 | |
| Edna Liebman | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | |
| G. Lighton | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | |
| A. Miller | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | |
| F. H. Reid | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | $145\frac{1}{2}$ | |
| H. C. Nanson | 29 | 29 | 29 | 29 | |
| E. W. Evans | 1 | | | | |
| G. A. Laws | 1 | | | | |
| H. L. Weaver | 1 | | | | |
| Barney Allis | 1 | 3,825 | 3,625 | 3,625 | |
| Dorothy Kovitz | | | 100 | 100 | |
| Helen Starling | | | 100 | 100 | |
| Trianon Hotel Co | | | | | 7,209 |
| Total | 7,209 | 7,209 | 7,209 | 7,209 | 7,209 |

The relationships of those who held common stock of Allis Corporation as of December 31, 1949, are as follows, as far as the record shows: Charles Allis is a brother of Barney Allis, and Dorothy Kovitz and Helen Starling are daughters of Barney Allis. Meyer Shanberg was a cousin of Barney Allis. Edna Liebman and Gertrude Lighton are sisters of Herbert Woolf. W. C. LeClerc was a business associate of

Barney Allis for over 20 years, and Caroline LeClerc, presumably, is his wife. Arthur Miller is an attorney for Barney Allis and was an attorney for Allis Corporation. H. C. Nanson was an employee of Barney Allis. F. H. Reid was a business associate of Woolf.

Allis Corporation owned 4 lots and held a 98- or 99-year lease on 3 lots, all of which were contiguous and had their frontage on Broadway, extending from the corner of William Street in the best downtown section of Wichita. The hotel building is located on lots 13, 15, 17, 19, and 21, on the southeast corner of William Street and Broadway. Allis Corporation owned lots 19 and 21; it held a 98-year lease expiring December 31, 2026, on lot 17; and it held a 99-year lease expiring August 31, 2027, on lots 13 and 15. The parcel of land called lots 13 and 15 extended east on William Street for 140 feet. The entire parcel of land on which the hotel building is located measures 140 by 125 feet. The address of the Allis Hotel is 200-208 Broadway.

Next to the parcel of land where the hotel building is located, on the south side, is lot 23, which is 140 by 25 feet, having the address 214 Broadway, on which Allis Corporation held a 99-year lease expiring January 31, 2036. This lot Allis Corporation rented for $275 per month in about 1951. Next to lot 23 are lots 25 and 27 which were owned by Allis Corporation. On lots 25 and 27 were store buildings which, in about 1951, were rented for $300 and $400 per month. On lots 29 and 31, which were owned by Allis Corporation, next to lot 27, was a store building which was rented for $400 per month. On lot 33, which was owned by Allis Corporation, next to lot 31, was a store building which was rented in about 1951 for $300 per month.

The net income, or loss, of Allis Corporation for each of the years 1931 through 1951, before taxes and after taxes, was as follows:

| Year | Net income | | Year | Net income | |
| | Before taxes | After taxes | | Before taxes | After taxes |
| --- | --- | --- | --- | --- | --- |
| 1931 | $2,128.04 | $2,128.04 | 1942 | $133,759.70 | $50,196.34 |
| 1932 | (23,121.65) | (23,121.65) | 1943 | 244,472.76 | 58,789.99 |
| 1933 | (12,987.79) | (12,987.79) | 1944 | 227,610.48 | 62,862.75 |
| 1934 | 30,850.17 | 26,004.86 | 1945 | 227,518.46 | 61,834.58 |
| 1935 | 52,975.31 | 44,225.49 | 1946 | 232,774.88 | 141,908.04 |
| 1936 | 71,465.72 | 60,335.15 | 1947 | 281,584.99 | 172,323.88 |
| 1937 | 68,759.76 | 54,007.84 | 1948 | 303,640.10 | 185,937.83 |
| 1938 | 61,000.78 | 48,308.27 | 1949 | 288,714.61 | 176,193.77 |
| 1939 | 48,669.88 | 39,064.29 | 1950 | 281,051.42 | 163,319.55 |
| 1940 | 60,210.55 | 44,722.55 | 1951 | 338,240.65 | 145,440.29 |
| 1941 | 105,823.49 | 70,516.64 | | | |

The earned surplus, capital stock, and net worth of Allis Corporation for the years 1930 through 1951 were as follows:

| Year | Earned surplus | Capital stock | Net worth |
|---|---|---|---|
| 1930 | ($9,003.54) | $176,990.75 | $167,987.21 |
| 1931 | (6,875.50) | 184,709.00 | 177,833.50 |
| 1932 | (17,997.15) | 184,709.00 | 166,711.85 |
| 1933 | (30,800.42) | 184,709.00 | 153,908.58 |
| 1934 | (3,430.60) | 184,709.00 | 181,278.40 |
| 1935 | 40,794.89 | 184,709.00 | 225,503.89 |
| 1936 | 44,909.91 | 144,709.00 | 189,618.91 |
| 1937 | 71,770.12 | 144,709.00 | 216,479.12 |
| 1938 | 120,078.39 | 144,709.00 | 264,787.39 |
| 1939 | 144,526.02 | 7,209.00 | 151,735.02 |
| 1940 | 189,216.11 | 7,209.00 | 196,425.71 |
| 1941 | 246,483.94 | 7,209.00 | 253,692.94 |
| 1942 | 299,110.70 | 7,209.00 | 306,319.70 |
| 1943 | 363,263.51 | 7,209.00 | 370,472.51 |
| 1944 | 412,336.58 | 7,209.00 | 419,545.58 |
| 1945 | 446,674.88 | 7,209.00 | 453,883.88 |
| 1946 | 566,955.92 | 7,209.00 | 574,164.92 |
| 1947 | 727,047.77 | 7,209.00 | 734,256.77 |
| 1948 | 874,222.03 | 7,209.00 | 881,431.03 |
| 1949 | 1,014,370.80 | 7,209.00 | 1,021,579.80 |
| 1950 | 925,375.35 | 7,209.00 | 932,584.35 |
| 1951 | 1,062,396.14 | 7,209.00 | 1,069,604.14 |

Allis Corporation did not pay preferred stock dividends in the years 1930–1935 but it paid dividends on its preferred stock during the years 1936–1939, inclusive, as follows:

### ALLIS PREFERRED STOCK DIVIDENDS

| Year | Amount |
|---|---|
| 1936 | $56,220.13 |
| 1937 | 28,875.00 |
| 1938 | ---------- |
| 1939 | 14,437.50 |

Allis Corporation did not pay common stock dividends in the years 1930–1942, but it paid dividends on its common stock beginning in 1943 through 1951, as follows:

### ALLIS COMMON STOCK DIVIDENDS

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1943 | $14,418.00 | 1948 | $36,045.00 |
| 1944 | 21,627.00 | 1949 | 36,045.00 |
| 1945 | 14,418.00 | 1950 | 252,330.00 |
| 1946 | 21,627.00 | 1951 | 8,419.50 |
| 1947 | 21,627.00 | | |

The Hotel Muehlebach, located in Kansas City, Missouri, was owned and operated, prior to 1932, by the Whitmore Company. In 1932, the Whitmore Company was in financial difficulties.

Trianon, a corporation organized under the laws of Missouri, was created on January 24, 1932, for the purpose of acquiring and operating the Hotel Muehlebach. Trianon acquired the Hotel Muehlebach and its operating assets from the Whitmore Company in exchange for its agreement to assume the liabilities of the Whitmore Company. Trianon has owned and operated the Hotel Muehlebach continuously since 1932.

Trianon's authorized stock consisted of 10,000 shares of preferred stock having a par value of $25 per share, and 10,000 shares of common stock having a par value of $5 per share. All of the outstanding preferred stock was redeemed in 1942.

Barney L. Allis was president of Trianon and a member of its board of directors from the time of its organization in 1932 through 1956; he was also treasurer during the years 1932 through 1935, and 1944 through 1956; and he was assistant treasurer from 1936 through 1943. Meyer Shanberg was executive vice president of Trianon in 1952 and 1953, and he was a member of the board of directors during the years 1932 through 1952. Woolf was vice president of Trianon from 1942 through 1951; he was assistant treasurer from 1944 through 1951; and he was a member of the board of directors from 1932 through 1956.

Of the 10,000 shares of authorized common stock of Trianon, 9,330⅔ were issued in 1932, and that amount was outstanding during the succeeding years through 1956. The original holders of the common stock and the number of shares which each held on February 2, 1932, were as follows: Barney Allis owned 2,501 shares; Frank J. Dean held 2,501 shares; Charles Mosby held 1,000 shares; and the other stockholders were Conrad Mann, 833⅓; Meyer Shanberg, 668; James F. Porter, 640; Herbert Woolf, 334; Commerce Trust Company, 334; Hartzfeld's Inc., 250⅓; Miles & Moser, 84; Rothenberg & Schloss, 84; Charles H. Price, 67; and Arthur Miller, 34.

As of December 31, 1948, Trianon held 1,739½ shares of the common stock of the company in its treasury, and 7,591⅓ shares of common stock were held by the individual stockholders who are listed below. These individuals were the owners of the same amounts of common stock during 1949, 1950, 1951, and 1952. The percentage of 7,591⅓ shares held by each is set forth in the following table:

TRIANON HOTEL COMPANY

INDIVIDUAL OWNERS OF COMMON STOCK

| Stockholder | Dec. 31, 1948–1952 | Per cent |
|---|---|---|
| M. B. Shanberg | 1,610⅔ | 21.2172 |
| Paul Shanberg [1] | 150 | 1.9579 |
| Gerald Shanberg [1] | 150 | 1.9579 |
| Pauline Shanberg | 62 | .8167 |
| H. M. Woolf | 1,003⅔ | 13.2212 |
| Barney Allis | 3,392 | 44.6825 |
| Chas. S. Allis | 50 | .6587 |
| Dorothy Kovitz | 500 | 6.5865 |
| Helen Starling | 500 | 6.5865 |
| Arthur Miller | 89 | 1.1724 |
| Byrde S. Price | 82 | 1.0802 |
| H. S. Shue | 1 | .0132 |
| James Kemper | 1 | .0132 |
| Total | 7,591⅓ | 100.0000 |

[1] Nephews of M. B. Shanberg who held the shares as trustee for their benefit.

Trianon's earned surplus, capital stock, and net worth in the period 1932 through 1952 were as follows:

| Year | Earned surplus | Capital stock | Net worth |
|---|---|---|---|
| 1932 | ($27, 501. 66) | $278, 667. 50 | $251, 165. 84 |
| 1933 | (45, 039. 48) | 276, 157. 50 | 231, 118. 02 |
| 1934 | 15, 657. 44 | 276, 157. 50 | 291, 814. 94 |
| 1935 | 105, 699. 66 | 276, 157. 50 | 381, 857. 16 |
| 1936 | 156, 763. 83 | 249, 536. 67 | 406, 300. 50 |
| 1937 | 181, 180. 29 | 234, 511. 67 | 415, 691. 96 |
| 1938 | 196, 158. 06 | 224, 524. 17 | 420, 682. 23 |
| 1939 | 209, 273. 40 | 214, 524. 17 | 423, 797. 57 |
| 1940 | 211, 392. 74 | 184, 524. 17 | 395, 916. 91 |
| 1941 | 235, 392. 96 | 174, 649. 17 | 410, 042, 13 |
| 1942 | 273, 380. 78 | 46, 690. 83 | 320, 071. 61 |
| 1943 | 390, 663. 97 | 46, 690. 83 | 437, 354. 80 |
| 1944 | 505, 197. 32 | 46, 690. 83 | 551, 888. 15 |
| 1945 | 704, 470. 18 | 46, 690. 83 | 751, 161. 01 |
| 1946 | 1, 010, 123. 55 | 46, 690. 83 | 1, 056, 814. 38 |
| 1947 | 1, 337, 416. 97 | 46, 690. 83 | 1, 384, 107. 80 |
| 1948 | 1, 604, 439. 63 | 46, 690. 83 | 1, 651, 130. 46 |
| 1949 | 1, 770, 950. 19 | 46, 690. 83 | 1, 817, 641. 02 |
| 1950 | [1] 2, 156, 484. 14 | 46, 690. 83 | 2, 203, 174. 97 |
| 1951 | [1] 2, 317, 804. 22 | 46, 653. 33 | 2, 364, 457. 55 |
| 1952 | [1] 2, 670, 878. 33 | 46, 653. 33 | 2, 717, 531. 66 |

[1] Adjusted by the parties.

The holders of the common stock of Allis Corporation and Trianon, the relationship of the stockholders to each other, and the percentage of the total outstanding common stock owned by each stockholder in each of the two corporations were as follows on December 7, 1950:

| Name | Shares of Allis | | Shares of Trianon | |
|---|---|---|---|---|
| | No. | Per cent of total | No. | Per cent of total |
| Barney L. Allis | 3, 625 | 50. 2844 | 3, 392 | 44. 6825 |
| Dorothy A. Kovitz (daughter of Barney L. Allis) | 100 | 1. 3372— | 500 | 6. 5865 |
| Helen A. Starling (daughter of Barney L. Allis) | 100 | 1. 3372— | 500 | 6. 5865 |
| Charles S. Allis (brother of Barney L. Allis) | 154 | 2. 1362 | 50 | . 6587 |
| M. B. Shanberg (cousin of Barney L. Allis) | 1, 600½ | 22. 2014 | 1, 610¾ | 21. 2172 |
| M. B. Shanberg, Trustee for Paul M. Shanberg (nephew of M. B. Shanberg) | | | 150 | 1. 9579 |
| M. B. Shanberg, Trustee for Gerald H. Shanberg (nephew of M. B. Shanberg) | | | 150 | 1. 9579 |
| Pauline Shanberg (wife of M. B. Shanberg) | | | 62 | . 8167 |
| Herbert M. Woolf | 727½ | 10. 0916 | 1, 003¾ | 13. 2212 |
| Gertrude Lighton (sister of Herbert M. Woolf) | 145½ | 2. 0183 | | |
| Edna Liebman (sister of Herbert M. Woolf) | 145½ | 2. 0183 | | |
| H. S. Shue | | | 1 | . 0132— |
| James M. Kemper | | | 1 | . 0132— |
| Byrde S. Price | | | 82 | 1. 0802 |
| Caroline I. LeClerc | 291 | 4. 0366 | | |
| H. C. Nanson | 29 | . 4023 | | |
| F. H. Reid | 145½ | 2. 0183 | | |
| Mabel Miller | 145½ | 2. 0183 | | |
| Arthur Miller | | | 89 | 1. 1724 |
| Total shares outstanding | 7, 209 | 100. 0000 | 7, 591½ | 100. 0000 |
| Treasury stock | | | 1, 739½ | |
| Total shares issued | 7, 209 | | 9, 330¾ | |

On August 4, 1950, Byron E. Calhoun, an experienced hotel operator, made a written offer to purchase either all of the assets or all of the outstanding stock of Allis Corporation for $2,300,000. Prior to this formal offer, Calhoun had obtained permission from Allis, in

the latter's capacity as president of Allis Corporation, to consult with George O. Podd, so that Podd could advise Calhoun as to what would be a fair offer. Podd, a certified public accountant, was a partner in the firm which audited the books of Allis Corporation, and which had also, over a period of years, rendered accounting services for corporations in which Calhoun had interests. Podd advised Calhoun that the value of the Allis Hotel properties was $2,100,000, but that Calhoun could go as high as $2,500,000 if the working capital and additional realty belonging to Allis Corporation were to be included in the transaction. Podd arrived at his valuation by capitalizing 7½ times the earnings of Allis Corporation for the 5-year period 1945 through 1949.

In addition to the Calhoun offer, other individuals expressed interest in purchasing the Allis Hotel properties. Informal preliminary negotiations were held in 1948 with C. H. Alberding, an experienced hotel operator; Howard Wheeler, who represented a group of Chicago investors; and, in 1950, with Edgar Moss, a representative of the Pick Hotels Corporation.

The Allis Hotel properties were not sold to any of the above-mentioned individuals.

On December 5, 1950, at a special meeting of the directors of Trianon, the officers of Trianon were authorized to enter into a "Stock Purchase Agreement" with the shareholders of Allis Corporation providing for the purchase of all the outstanding shares of Allis Corporation stock for $2,342,925, or a per share price of $325. The above-mentioned stock purchase agreement was entered into on December 7, 1950, with Trianon as buyer, and the following individuals collectively referred to as sellers: Barney L. Allis, Charles S. Allis, Dorothy A. Kovitz, Caroline I. LeClerc, Edna Liebman, Gertrude Lighton, Mabel Miller, H. C. Nanson, Jr., F. H. Reid, M. B. Shanberg, Helen A. Starling, and Herbert M. Woolf.

The agreement between Trianon and each or all of the sellers provided, in part, as follows:

Each of the Sellers agrees to and does hereby sell, transfer, assign and set over unto Trianon, and Trianon agrees to and does hereby purchase, all of the common shares of Allis held by each of the Sellers at the price of $325.00 per share, payable $75.00 per share on December 15, 1950, and the remaining $250.00 per share in five annual installments as follows: $25.00 per share on the 15th day of December in each of the years 1951, 1952, 1953, and 1954, and $150.00 per share on December 15, 1955. Each of said five annual installments shall bear interest from the 15th day of December, 1950, at the rate of 3 per cent per annum, payable at the maturity or date of prepayment thereof, and shall be subject to prepayment without permission at any time and from time to time on and after January 1, 1951, provided that no particular annual installment due any one Seller shall be paid at a faster or greater rate than the same annual installment due all of the other Sellers.

The above agreement also encompassed a "Collateral Trust Agreement" between Trianon and Allis, Woolf, and Shanberg as trustees for the benefit of all the selling shareholders. Pursuant to the provisions included therein, the shares of stock purchased by Trianon were to be reissued in a single certificate representing the 7,209 outstanding shares. The certificate was to be endorsed in blank by Trianon, and pledged with the trustees for the Allis shareholders as security for the equal protection of all the noteholders.

In addition, the agreement provided that Trianon had the right, as long as it was not in default on payment of the notes, to liquidate Allis Corporation, take over the latter's assets, and substitute a mortgage of the assets in place of the pledged stock certificate as security for the payment of the notes. The Commerce Trust Company of Kansas City, Missouri, was made escrow agent for the deposit and delivery of the shares of Allis Corporation stock sold to Trianon, and for the payment of the purchase price, including the notes evidencing the payments to be deferred.

Sometime prior to December 15, 1950, Trianon sold United States bonds for $667,199.32, and deposited the net proceeds, $667,058.50, in a special account with the Commerce Trust Company, the above-mentioned escrow agent. On December 15, 1950, the due date for the cash payment of $75 per share required by the purchaser, Trianon issued a check for $540,675 on its special account. The check was made payable to "Commerce Trust Co." The Commerce Trust Company, in its capacity as escrow agent, distributed the proceeds of the check, and the five notes evidencing the five installment payments due, to each of the selling shareholders of Allis Corporation, in the following manner:

| Name | Shares sold | Cash payment $75 per share | Less stamp taxes of | Total | Five notes aggregating |
|---|---|---|---|---|---|
| Barney Allis | 3,625 | $271,875.00 | $217.50 | $271,657.50 | $906,250 |
| Charles S. Allis | 154 | 11,550.00 | 9.24 | 11,540.76 | 38,500 |
| Dorothy A. Kovitz | 100 | 7,500.00 | | 7,500.00 | 25,000 |
| Caroline I. LeClerc | 291 | 21,825.00 | | 21,825.00 | 72,750 |
| Edna Liebman | 145½ | 10,912.50 | | 10,912.50 | 36,375 |
| Gertrude Lighton | 145½ | 10,912.50 | 8.76 | 10,903.74 | 36,375 |
| Mabel Miller | 145½ | 10,912.50 | | 10,912.50 | 36,375 |
| H. C. Nanson, Jr | 29 | 2,175.00 | | 2,175.00 | 7,250 |
| F. H. Reid | 145½ | 10,912.50 | 8.76 | 10,903.74 | 36,375 |
| M. B. Shanberg | 1,600½ | 120,037.50 | 96.06 | 119,941.44 | 400,125 |
| Helen A. Starling | 100 | 7,500.00 | 6.00 | 7,494.00 | 25,000 |
| Herbert M. Woolf | 727½ | 54,562.50 | 43.68 | 54,518.82 | 181,875 |
| Total | 7,209 | 540,675.00 | 390.00 | 540,285.00 | 1,802,250 |

In accordance with the provisions of the stock purchase agreement, certificates representing the 7,209 outstanding shares of Allis Corporation stock were transferred to Trianon on the stock records of Allis Corporation, and a new certificate was issued to Trianon. Trianon then endorsed the new certificate in blank, and delivered it

to the trustees for the benefit of the selling shareholders to secure the remaining amount of $1,802,250 still due on the outstanding notes.

On December 11, 1951, Trianon issued a check in the amount of $185,631.78, in payment of the notes held by the former shareholders of Allis Corporation which were due on December 15, 1951, in the principal amount of $180,225, with interest of $5,406.78. The notes were surrendered for payment to the Commerce Trust Company and were canceled.

As of January 1, 1952, the total balance due on the notes of Trianon, which have been referred to above, which were held by all of the former stockholders of Allis Corporation, was $1,622,025, and the interest accrued to July 1, 1952, on the notes, amounted to $75,153.83. The total indebtedness was, therefore, $1,697,178.83. The notes were registered notes due serially on December 15, 1952, 1953, 1954, and 1955.

On July 1, 1952, Trianon borrowed $1,350,000 from the Equitable Life Assurance Society, a New York corporation having its principal office in New York City. Equitable's loan was for 20 years and carried 4½ per cent interest. Trianon gave Equitable a first mortgage on the Allis Hotel property, the land and the building. Trianon borrowed the above sum for the purpose of paying the entire amount due on its notes.

Trianon advanced from its own funds $347,178.83. That amount and the $1,350,000 of borrowed funds were deposited with the Commerce Trust Company, the escrow agent, in a special account. The outstanding notes and the accrued interest were paid upon delivery to Commerce Trust Company. The notes were canceled and delivered to Trianon. All of the outstanding notes were paid by July 21, 1952.

The following schedule sets forth the names of the holders of the notes, the group in which each note belonged, and the amounts of principal and accrued interest which were paid:

| Holders of notes | Group | Numbers of notes | Principal | Interest to July 1, 1952 |
|---|---|---|---|---|
| Barney L. Allis | A | 2/5 | $815,625.00 | $37,790.62 |
| Charles S. Allis | B | 2/5 | 34,650.00 | 1,605.45 |
| Dorothy A. Kovitz | C | 2/5 | 22,500.00 | 1,042.50 |
| Caroline I. LeClerc | D | 2/5 | 64,475.00 | 3,033.68 |
| Edna W. Liebman | E | 2/5 | 32,737.50 | 1,516.84 |
| Gertrude W. Lighton | F | 2/5 | | |
| Herbert M. Woolf (assgn. to Gertrude W. Lighton) | L | 2/3 | 69,112.50 | 3,202.21 |
| H. C. Nanson, Jr | H | 2/5 | 6,525.00 | 302.33 |
| F. H. Reid | I | | 32,737.50 | 1,516.84 |
| M. B. Shanberg | J | 2/5 | 360,112.50 | 16,685.21 |
| Helen A. Starling | K | 2/5 | 22,500.00 | 1,042.50 |
| Herbert M. Woolf | L | 4/5 | 127,812.50 | 5,898.81 |
| Mabel Miller | G | 2/5 | 32,737.50 | 1,516.84 |
| Total | | | 1,622,025.00 | 75,153.83 |

Received the above described Notes this 21st day of July, 1952.

(signed) Barney L. Allis

Received of Commerce Trust Company, escrow agent under Collateral Stock Purchase Agreement, Certificate No. 52 for 7,209 shares of the Capital stock of the Allis Hotel Corporation.

TRIANON HOTEL COMPANY
(signed) Barney L. Allis

On their tax returns for 1950, the year in which the Allis Corporation shareholders entered into the above-described stock purchase agreement with Trianon, Allis, Woolf, and Shanberg reported the receipt of the cash and notes from Trianon as long-term capital gains of $1,173,742.60, $235,656.32, and $518,465.94, respectively, in the following manner:

|  | Allis | Woolf | Shanberg |
|---|---|---|---|
| Number of shares sold | 3,625 | 727½ | 1,600½ |
| Sale price per share | $325.00 | $325.00 | $325.00 |
| Received in cash | 271,875.00 | 54,562.50 | 120,037.50 |
| Received in notes | 906,250.00 | 181,875.00 | 400,125.00 |
| Gross proceeds | 1,178,125.00 | 236,437.50 | 520,162.50 |
| Less: | | | |
| Cost of stock | 4,164.90 | 737.50 | 1,600.50 |
| Expense of sale | 217.50 | 43.68 | 96.06 |
|  | 4,382.40 | 781.18 | 1,696.56 |
| Long-term capital gain | 1,173,742.60 | 235,656.32 | 518,465.94 |

Respondent determined that the cash and notes received by Allis, Woolf, and Shanberg were dividends received in 1950 in the amounts of $1,178,125, $236,473.50, and $520,162.50, respectively. Respondent, in the notice of deficiency issued to Allis, gave the following explanation for his determination:

(a) You transferred 3,625 shares of stock of the Allis Hotel Corporation to the Trianon Hotel Company pursuant to an agreement dated December 7, 1950. The Trianon Hotel Company agreed to pay $325.00 per share for this stock, payable $75.00 a share on December 15, 1950, and $250.00 per share in notes which were subsequently redeemed at 100 per cent of par less interest. You reported this transaction as a sale of your Allis Hotel Corporation stock, considering that the notes were worth face value, and thereby reported a long-term capital gain.

In view of the fact that you owned stock of the Allis Hotel Corporation and the Trianon Hotel Company in substantially the same proportions, the amount received in cash and notes is held to be an ordinary dividend as provided by the provisions of Section 115 (a) of the 1939 Internal Revenue Code. Therefore, an amount of $1,178,125.00 is included as dividend income, computed as follows:

| | |
|---|---|
| Number of shares | 3,625 |
| Received per share | $325 |

$1,178,125

Respondent made substantially the same explanation in the notice of deficiency issued to Woolf; however, since he transferred 727½ shares of Allis Corporation stock to Trianon, he was held to have received $236,473.50 as dividend income.

Respondent, in the notice of deficiency issued to Shanberg, gave the following explanation for his determination:

(b) and (c). It is held that the cash and notes received from Trianon Hotel Company, December 15, 1950 in the amount of $520,162.50 constitute a construc-

tive dividend under the provisions of Section 115 (a) of the Internal Revenue Code of 1939. Accordingly, dividend income shown on your return is increased $520,162.50.

As a result of the foregoing, the net capital gain reported on your return has been decreased $259,232.97 * * *

Respondent, by amended answers to the respective petitions of Allis, Woolf, and Shanberg, alleges that the above petitioners realized income within the intendment of sections 22 (a), 115 (g), and 112 (c) (2), 1939 Code, in addition to section 115 (a) as determined in the deficiency notice.

On November 30, 1951, at a regular monthly meeting of Trianon's board of directors, the officers of Trianon were authorized to liquidate Allis Corporation and transfer its assets to Trianon. These actions were to be taken not later than December 31, 1951. In addition, the officers were to cause Trianon to become duly qualified and licensed to do business as a foreign corporation in the State of Kansas.

The directors also voted to cause Allis Corporation, immediately prior to its liquidation, to declare a dividend on its capital stock, in the amount of its net earnings after income taxes since December 15, 1950, less any dividends already declared and paid during that period. This dividend was to be payable as soon as the amount could be determined. The purpose of the dividend was stated in the minutes of the meeting to be "to the end that [Trianon] shall, pursuant to such liquidation of Allis, take over and acquire that quantum of the assets of Allis in existence at the time [Trianon] acquired and received the delivery of said stock."

On December 29, 1951, a special combined meeting of the stockholders and directors of Allis Corporation was held for the purpose of voting the preliquidation dividend authorized by the directors of Trianon, and adopting the resolutions of liquidation transferring all the assets of Allis Corporation to Trianon subject to outstanding liabilities. Allis Corporation declared a dividend of $8,419.50 immediately prior to its liquidation, and this dividend was in due course paid to Trianon. The remaining earnings and profits of Allis Corporation accumulated since December 15, 1950, presumably offset the increase in Allis Corporation's liabilities for the same period. On December 21, 1951, Allis Corporation filed its "Resolution of Dissolution" with the secretary of state of Kansas.

On December 31, 1951, the directors of Trianon held a special meeting wherein the final resolutions were adopted giving effect to the liquidation of Allis Corporation. The minutes of the meeting listed the assets of Allis Corporation transferred to Trianon as follows:

As a part of its liquidation, said The Allis Hotel Corporation is this day executing and delivering to this Company an indenture of Conveyance and

Sale, a Warranty Deed, three Leasehold Assignments, various Assignments of life insurance policies on the life of Barney L. Allis, and various Assignments of business insurance, all dated December 31, 1951, and conveying, transferring, assigning and settling over unto this Company (a) Lots 19, 21, 25, 27, 29, 31 and 33 on Lawrence Avenue (now Broadway) in N. A. English's Addition to the City of Wichita, Kansas; (b) all and entire its leasehold interests and estates of and to Lots 13 and 15, and of and to Lot 17, and of and to Lot 23,—all in said Addition; (c) all fixtures (including machinery and building equipment), and all furniture, furnishings, draperies, hangings, carpeting and equipment, of every kind and character, contained in the Allis Hotel situate on the above described Lots 13, 15, 17, 19 and 21; (d) four policies of life insurance on the life of Barney L. Allis with Midland Life Insurance Company (assumed by Kansas City Life Insurance Company), numbered, respectively, M 45784 A, M 45784 B, M 73971 and M 90780, for the face amounts, respectively, of $10,000.00, $5,000.00, $25,000.00, $25,000.00, and with Business Men's Assurance Company Nos. L. 237250/1 in the face amount of $5,000.00 each, and with Connecticut Mutual Life Insurance Company, No. 729741, in the face amount of $25,000.00; (e) all business insurance.

On December 31, 1951, an affidavit was filed with the secretary of state of Kansas giving notice of the dissolution of Allis Corporation. With the filing of this notice, Allis Corporation was dissolved.

The assets, liabilities, and net worth of the Allis Corporation on December 31, 1951, the date of its dissolution, as shown by its balance sheet, were, respectively, $1,297,138.49, $229,657.20, and $1,067,481.29. The book value of all of the assets and the amounts of liabilities, according to an abbreviated balance sheet, were as follows:

### ASSETS

| | |
|---|---:|
| Cash—Commerce Trust Co | $250,000.00 |
| Cash—4th National Bank & House Funds | 23,464.70 |
| Notes receivable | 55.00 |
| Life insurance—cash surrender value | 31,955.34 |
| U. S. Bonds | 12,500.00 |
| Accounts receivable | 20,839.86 |
| Inventories | 32,333.93 |
| Prepaid expense | 15,568.74 |
| Land (fee): | |
| Lots 19, 21 | 61,468.95 |
| Lots 25, 27, 29, 31, 33 | 88,700.00 |
| Leaseholds: | |
| Lots 13, 15, 17 | 0 |
| Lot 23 | 0 |
| Buildings: | |
| Hotel building | 634,497.82 |
| Store bldg., lots 25, 27 | 5,775.00 |
| Store bldg., lots 29, 31 | 16,666.60 |
| Store bldg., lot 33 | 13,333.40 |
| Furniture and equipment | 79,665.53 |
| Operating equipment | 10,313.62 |
| Total assets | 1,297,138.49 |

LIABILITIES

| | |
|---|---|
| Accounts receivable (credit balances) | $1,073.26 |
| Accounts payable | 19,781.21 |
| Accruals (including payroll) | 13,924.25 |
| Income taxes for 1951 | 192,800.36 |
| Payroll deductions | 2,078.12 |
| Total liabilities | 229,657.20 |
| Net worth | 1,067,481.29 |

On Trianon's balance sheet, as of December 31, 1951, the acquired stock of Allis Corporation was given a value equal to its cost, $2,342,925. When Trianon liquidated Allis Corporation, thereby acquiring its assets and assuming its liabilities, Trianon took certain steps, described hereinafter, on the theory that it was entitled to carry the acquired assets at a book value equal to the above-mentioned cost of Allis Corporation's stock, for purposes of computing depreciation and amortization deductions. Consistent with this theory, Trianon, as of January 1, 1952, closed out the account on its books entitled "Investment—Allis Corp. common stock," and transferred the amount at which the stock had been carried, i. e., its cost to Trianon, $2,342,925, to the assets it acquired on the date of Allis Corporation's liquidation. The above-mentioned amount was allocated to each asset or group of assets comprising the land, leaseholds, buildings, furniture, equipment, and current assets which formerly belonged to Allis Corporation.

Trianon, to establish the values at which each asset or group of assets would be carried on its books, had appraisals made of the acquired tangible assets and leaseholds in December 1951, and the early part of 1952. It employed the Southwestern Appraisal Company, Kansas City, Missouri, to appraise the furniture, fixtures, and equipment in the Allis Hotel, and Max Skeer and Ray R. Reece, both of Kansas City, Missouri, to appraise the acquired land, leaseholds, and buildings. The total appraised value of the acquired tangible assets was $2,339,847.93, and consisted of the following estimations: The land and leaseholds were estimated to have a fair market value of $283,000; the hotel building and adjoining store buildings were estimated to have a present sound value, i. e., estimated replacement cost less depreciation for wear and tear, of $1,655,000; and, the furniture, fixtures, and equipment were estimated to have a present sound value of $401,847.93.

Trianon arrived at a total estimated value for all of the acquired assets of $2,507,221.92. This total was arrived at by adding the book value of the acquired current assets, $397,031.19, to the total appraised value of the tangible assets and leaseholds, $2,339,847.93, and subtracting the acquired liabilities, $229,657.20. The total exceeded by $164,296.92 the amount which Trianon wished to allocate to the acquired assets, i. e., $2,342,925, the cost of Allis Corporation's stock.

Trianon, to eliminate this excess, proportionately reduced the appraised value of the leaseholds, and of each tangible asset or group of tangible assets, and the resulting adjusted values were used by Trianon for purposes of computing depreciation and amortization. The above-described adjustments are set forth hereinafter.

Trianon, on its income tax return for 1952, claimed depreciation deductions in the amount of $207,630.95, and amortization of leaseholds in the amount of $12,032.40. Of these amounts, Trianon deducted $101,061.96 for depreciation of the buildings, furniture, and fixtures, and claimed amortization of $700.32 for leaseholds formerly belonging to Allis Corporation. Trianon, in arriving at the above amounts, allocated the total of $2,342,925 among the properties acquired from Allis Corporation, in the following manner: $1,912,414.52 to depreciable assets, $53,925.43 to amortizable assets, and $376,585.05 to current assets and nondepreciable land.

Respondent, in a statement attached to his deficiency notice disallowing certain depreciation deductions and amortization claimed by Trianon in its 1952 return, made the following determinations:

(b) On your return total depreciation was claimed in the amount of $207,-630.95. It is held that the amount allowable, under the provisions of section 23 (1) and 113 (a) (15) of the Internal Revenue Code of 1939, is $152,365.07. Your income is therefore increased in the amount of $55,265.88.

(c) On your return a deduction was claimed for amortization of. leaseholds in the amount of $12,032.40. It is herein held that the allowable deduction for amortization is $11,454.00, which results in the disallowance of $578.40.

Respondent explained the above-described adjustments as reflecting his determination that the basis of the properties of Allis Corporation acquired by Trianon was, for the purpose of computing depreciation and amortization, the same basis that such assets had in the hands of Allis Corporation as of December 31, 1951, i. e., $1,067,481.29, increased by 17.4226662 per cent of the amount by which Trianon's cost for the stock of Allis Corporation exceeded Allis Corporation's basis for the acquired assets. The figure of 17.4226662 per cent represented the minority shareholder interests in Allis Corporation not owned by Allis, Woolf, or Shanberg. Since the amount which Trianon paid for the Allis Corporation stock exceeded the basis of the acquired assets in the hands of Allis Corporation by $1,275,443.71, respondent allocated $222,216.29 (17.4226662 per cent of $1,275,443.71) among the acquired assets, in his determination of Trianon's allowable depreciation and amortization deductions.

In an amendment to his answer, respondent now alleges that the properties acquired by Trianon retained the same basis they had in the hands of Allis Corporation as of December 31, 1951, and that in the original determination of Trianon's income tax deficiency, the basis of the acquired assets was erroneously increased by 17.4226662 per cent. This resulted in an erroneous allowance of deductions for

depreciation and amortization in the amounts of $11,784.22 [2] and $121.92, respectively. Respondent now contends, therefore, that Trianon's claimed deductions for depreciation and amortization should be disallowed in the total amounts of $67,050.10 [3] and $700.32, respectively.

Trianon, as mentioned above, had appraisals made of the tangible assets which it acquired when Allis Corporation was liquidated. In a report dated January 31, 1952, the Southwestern Appraisal Company transmitted to Trianon its completed appraisal of the furniture, fixtures, and equipment of the Allis Hotel. The report consisted of an inventory of the various items showing the "cost of new replacement based on the present market," and the "sound value" based on each item's "physical condition and its reasonable worth to the hotel" according to the opinion of the appraisers. The "sound value" of each item was computed by depreciating its estimated replacement cost by a percentage equal to the used-up portion of its probable useful life, determined by the item's present physical condition. Thus, if an item's replacement cost was depreciated 25 per cent, it was estimated that 75 per cent of its useful life still remained. The total replacement cost of the furniture, fixtures, and equipment was estimated at $625,591.98, and its present sound value at $402,781.18. However, some of the items, in the amount of $933.25, were later discovered not to have belonged to Allis Corporation. The present sound value was reduced by that amount, resulting in an adjusted sound value of $401,847.93.

In a report dated April 15, 1952, Skeer and Reece transmitted to Trianon its completed appraisal of the Allis Hotel building, and the land and store buildings also acquired by Trianon. Skeer and Reece arrived at their valuations using three different methods: First, they computed the fair market value of the land, plus the estimated replacement cost of the hotel building and store buildings, less depreciation of approximately 1½ per cent per year for each year that the buildings had been in existence, and arrived at a total value of $1,938,000. Second, they employed a "valuation by comparison" approach and arrived at a total valuation of $1,911,000. Third, they capitalized at 6 per cent the average earnings of Allis Corporation in the 10-year period, 1941–1950, the average earnings being $114,387, and arrived at a total valuation based on income of $1,906,000.

Trianon, after the appraisals were made, valued each tangible asset or group of assets, for purposes of depreciation and amortiza-

---

[2] In respondent's amended answer, he claimed that $12,865.19 was the amount of the erroneous depreciation allowance. He has apparently reduced that amount to $11,784.22, as evidenced by his brief and exhibits.

[3] In respondent's amended answer, he disallowed Trianon's claimed depreciation deductions in the amount of $68,131.07. He has apparently reduced the amount of disallowance to $67,050.10, as evidenced by his brief and exhibits.

tion, in the following manner: The acquired buildings, furniture, fixtures, and equipment were valued at their appraised sound values, and the land and leaseholds were valued at their appraised fair value. In addition, Trianon offset the current assets acquired from Allis Corporation by the assumed liabilities. The total value of the appraised tangible assets and the leaseholds, plus the net current assets, amounted to $2,507,221.92. Since this total exceeded the $2,342,925 which Trianon paid for the Allis Corporation stock by $164,296.92, Trianon adjusted the appraisals downward to coincide with the cost of the stock. The resulting adjusted values used by Trianon, on its 1952 income tax return, for the purpose of computing depreciation and amortization of the tangible assets and leaseholds formerly belonging to Allis Corporation, and the claimed depreciation or amortization, are as follows:

| | Values per 1952 return | Claimed depreciation or amortization, 1952 |
|---|---|---|
| Land: | | |
| Lots 19, 21 | $92, 984. 52 | |
| Lots 25, 27, 29, 31, 33 | 116, 226. 54 | |
| | 209, 211. 06 | |
| Buildings: | | |
| Hotel building | 1, 482, 998. 80 | $37, 182. 96 |
| Store bldg., lots 25, 27 | 22, 307. 74 | 1, 487. 04 |
| Store bldg., lots 29, 31 | 22, 307. 74 | 1, 487. 04 |
| Store bldg., lot 33 | 11, 162. 09 | 744. 12 |
| Total | 1, 538, 776. 37 | 40, 901. 16 |
| Furniture and Fixtures (formerly belonging to Allis Corp.): | | |
| Guest room furniture | 106, 699. 92 | 14, 226. 60 |
| Lobby and lounge furniture | 11, 380. 77 | 2, 008. 32 |
| Carpets and rugs | 48, 750. 05 | 15, 394. 80 |
| Curtains and drapes | 6, 649. 69 | 2, 659. 92 |
| Ballroom, dining room furniture, etc | 19, 577. 97 | 2, 700. 36 |
| Kitchen equipment | 29, 300. 69 | 4, 816. 56 |
| Prompto lunch equipment | 9, 482. 24 | 1, 250. 40 |
| Refrigeration compressors | 5, 446. 89 | 895. 32 |
| Storeroom, butcher shop | 1, 453. 38 | 355. 92 |
| Linen room equipment | 898. 26 | 163. 32 |
| Laundry equipment | 34, 257. 84 | 3, 574. 68 |
| Barber shop equipment | 4, 174. 80 | 945. 24 |
| Cigar stand equipment | 924. 68 | 181. 92 |
| Porter's desk equipment | 97. 66 | 18. 36 |
| Room service equipment | 486. 03 | 106. 08 |
| Print shop | 952. 81 | 190. 56 |
| Vacuum cleaners | 849. 37 | 254. 76 |
| Electric fans | 863. 76 | 167. 16 |
| Office machinery | 4, 204. 91 | 917. 40 |
| Building signs | 1, 291. 27 | 154. 92 |
| Office furniture and equipment | 3, 874. 81 | 522. 48 |
| Locker rooms | 1, 831. 13 | 289. 08 |
| Air conditioning equipment | 73, 704. 21 | 7, 249. 56 |
| Drinking water system | 696. 40 | 119. 40 |
| Fire extinguishers | 684. 02 | 69. 60 |
| Sundry | 5, 104. 59 | 928. 08 |
| Total | 373, 638. 15 | 60, 160. 80 |
| Total claimed depreciation | | 101, 061. 96 |
| Leaseholds: | | |
| Lots 13, 15, 17 | 44, 631. 91 | 589. 80 |
| Lot 23 | 9, 293. 52 | 110. 52 |
| Total (amortization) | 53, 925. 43 | 700. 32 |
| Total adjusted value of tangible assets and leaseholds | 2, 175, 551. 01 | |

Respondent in his deficiency notice, determined that Trianon's allowable depreciation and amortization in 1952, for the properties and leaseholds acquired from Allis Corporation, was $44,084.88 and $11,454, respectively. Respondent, in his amended answer and by subsequent adjustments, seeks to reduce Trianon's allowable depreciation and amortization, for the above-described properties, to $32,300.66 and $11,332.08, respectively. This represents a decrease in the depreciation and amortization determinations made in the deficiency notice of $11,784.22 and $121.92, respectively. Respondent, therefore, now seeks to disallow Trianon's claimed depreciation and amortization in the respective amounts of $67,050.10 and $700.32. Respondent's new claims are based on the following theory: The assets formerly belonging to Allis Corporation have the same basis for depreciation and useful lives in the hands of Trianon as they had in the hands of Allis Corporation as of December 31, 1951. The basis remaining for depreciation and the estimated life of each of the acquired assets, and the depreciation or amortization allowable to Trianon in 1952, as now claimed by respondent, are as follows:

| | Basis remaining for depreciation 12/31/51 | Estimated useful life 12/31/51 | Allowable depreciation or amortization, 1952 |
|---|---|---|---|
| **Land:** | | | |
| Lots 19, 21 | $61,468.95 | | |
| Lots 25, 27, 29, 31, 33 | 88,700.00 | | |
| **Buildings:** | | | |
| Hotel building | 634,497.82 | 40 years | $15,862.45 |
| Store bldg., lots 25, 27 | 5,775.00 | 15 years | 385.00 |
| Store bldg., lots 29, 31 | 16,666.60 | 15 years | 1,111.11 |
| Store bldg., lot 33 | 13,333.40 | 15 years | 888.89 |
| **Furniture and Equipment:** | | | |
| Guest room furniture | 7,434.91 | 90 months | 991.32 |
| Lobby and lounge furniture | 20.11 | Salvage value | 0 |
| Carpets and rugs | 20,589.56 | 38 months | 6,486.12 |
| Curtains and drapes | 0 | | 0 |
| Ballroom, dining room, etc | 140.31 | Salvage value | 0 |
| Kitchen equipment | 8,365.62 | 73 months | 1,375.20 |
| Prompto lunch equipment | 12,403.95 | 91 months | 1,635.72 |
| Refrigeration compressors, etc | 2,465.16 | 73 months | 405.24 |
| Storeroom and butcher shop | 0 | | 0 |
| Linen room equipment | 0 | | 0 |
| Laundry equipment | ·17,295.97 | 115 months | 1,804.80 |
| Barber shop equipment | 584.22 | 53 months | 132.24 |
| Cigar stand | 59.61 | Salvage value | 0 |
| Porter's desk | 0 | | 0 |
| Room service | 31.64 | Salvage value | 0 |
| Print shop | 64.40 | | 0 |
| Vacuum cleaners | 0 | | 0 |
| Electric fans | 0 | | 0 |
| Office machinery | 1,023.05 | 55 months | 223.20 |
| Building signs | 894.18 | 100 months | 107.28 |
| Office furniture and equipment | 224.86 | 89 months | 30.36 |
| Locker rooms | 0 | | 0 |
| Air conditioning | 7,407.29 | 122 months | 728.64 |
| Drinking water system | 0 | | 0 |
| Fire extinguishers | 0 | | 0 |
| Sundry | 495.22 | 66 months | 90.00 |
| Basement storage | 0 | | 0 |
| Time clock | 215.47 | 60 months | 43.09 |
| Total depreciation | | | 32,300.66 |
| **Leaseholds:** | | | |
| Lots 13, 15, 17 | 0 | | 0 |
| Lot 23 | 0 | | 0 |
| Total amortization | | | 0 |

Trianon, pursuant to an agreement entered into on August 31, 1955, sold the Allis Hotel, all the furniture and equipment therein, and Trianon's interest in the land underneath the hotel for $2,520,000 to the Boss-Wichita Hotel Co., Inc. The purchase price did not include any current assets, nor did Trianon sell any of its interest in the land adjoining the hotel. The buildings on the adjoining land had been razed prior to August 31, 1955, and the land was operated by Trianon as a parking lot.

### Excess Profits Tax Liability for 1952.

Trianon computed its excess profits tax for 1952 on Schedule EP (Form 1120), and filed it together with its 1952 income tax return on March 15, 1953. Trianon, a domestic corporation, was in existence and doing business prior to January 1, 1946, and its base period for excess profits tax purposes is the period January 1, 1946, through December 31, 1949. For the years 1950, 1951, and 1952, Trianon computed its base period net income under the general average method authorized by section 435 (d), 1939 Code, as follows:

| Year | Base period net income |
|---|---|
| 1946 | $551,008.86 |
| 1947 | 575,628.74 |
| 1948 | 554,859.59 |
| 1949 | 561,826.94 |

Trianon, for the years 1950, 1951, and 1952, computed its base period capital addition under section 435 (f), 1939 Code. Trianon's base period capital addition was $201,016.68.

Allis Corporation, for the years 1950 and 1951, filed its income tax returns and excess profits tax computations on March 16, 1951, and March 12, 1952, respectively. Allis Corporation, a domestic corporation, was in existence and commenced business prior to January 1, 1946, and its base period for excess profits tax purposes is the period, January 1, 1946, through December 31, 1949. For the years 1950 and 1951, it computed its base period net income under the general average method authorized by section 435 (d), as follows:

| Year | Base period net income |
|---|---|
| 1946 | $231,417.61 |
| 1947 | 279,802.00 |
| 1948 | 299,747.74 |
| 1949 | 286,581.80 |

Allis Corporation, for the years 1950 and 1951, computed its base period capital addition as $197,032.77, under section 435 (f). As of January 1, 1950, Allis Corporation had total assets of $1,228,810.75, total liabilities of $207,230.95, equity capital of $1,021,579.80, borrowed capital of $44,000, and no inadmissible assets.

Allis Corporation and Trianon were formed in different years as separate corporations. Allis Corporation and Trianon have always, until 1950, been treated as separate corporations, with their own books, records, bank accounts, property, and employees. They have also been consistently treated as separate corporations for Federal tax purposes.

The transfers by Allis, Shanberg, and Woolf of their stock in Allis Corporation were sales of capital assets, and the profits resulting from the transaction are taxable as capital gains.

The shares of Allis Corporation stock, sold by Allis, Shanberg, and Woolf to Trianon on December 7, 1950, had a fair market value on that date of $325 per share.

Trianon did not purchase the outstanding stock of Allis Corporation with the primary intention of acquiring the assets of the latter corporation.

The facts which have been stipulated are found as stipulated. The stipulation is incorporated herein by this reference.

OPINION.

HARRON, *Judge:* Allis Corporation's shareholders, on December 7, 1950, transferred all the outstanding stock of Allis Corporation to Trianon receiving $2,342,000, consisting of $540,675 in cash, and notes having a face value of $1,802,250. Prior to the date of the transfer, Allis, Shanberg, and Woolf together owned 5,953 shares, or 82.58 per cent, of the 7,209 shares of Allis Corporation's outstanding stock, and 6006⅓ shares, or 79.12 per cent, of the 7591⅓ shares of Trianon's outstanding stock.. As a result of the transfer, Allis, Shanberg, and Woolf together received a total of $1,934,725 from Trianon, consisting of $446,475 in cash, and notes with a face value of $1,488,250. On December 31, 1951, Trianon liquidated Allis Corporation, acquiring the latter corporation's assets and assuming its liabilities. The assets, liabilities, and net worth of Allis Corporation on December 31, 1951, as shown by its balance sheet, were, respectively, $1,297,138.49, $229,657,20, and $1,067,481.29.

Allis, Shanberg, and Woolf, on their income tax returns for 1950, reported the cash proceeds and the face value of the notes which they received upon the transfer of their stock in Allis Corporation, less the cost of the stock and expenses of sale, as long-term capital gains. Trianon, in computing depreciation and amortization on its income tax return for 1952, adjusted the bases of each group of assets it acquired from Allis Corporation, so that the total basis for all of the acquired assets equaled the amount Trianon distributed to Allis Corporation's sharerholders for their shares of stock, i. e., $2,342,925.

Respondent determined that Allis, Woolf, and Shanberg received dividend income rather than long-term capital gain, upon receipt of their respective shares of the cash and notes distributed by Trianon in 1950. Respondent also now claims that the basis for depreciation and amortization, in Trianon's hands, of the assets acquired from Allis Corporation, was the same as the basis in the hands of Allis Corporation as of December 31, 1951, i. e., $1,067,481.29, rather than the cost of Allis Corporation's stock in the amount of $2,342,925. We shall first consider respondent's determination as to Allis, Woolf, and Shanberg.

Respondent contends that the transaction in 1950 by which Trianon acquired the outstanding stock of Allis Corporation, and distributed cash and notes to the shareholders of Allis Corporation, was not a sale within the import of the taxing statutes. Respondent argues, therefore, that the purported sale to Trianon of the Allis Corporation stock owned by Allis, Shanberg, and Woolf, was, in actuality, a distribution of a taxable dividend under section 115, 1939 Code. Respondent also argues that the transaction was a reorganization, and that Trianon's distribution of cash and notes is taxable as a dividend under section 112 (c) (2).

Respondent, in the event that the above-described transaction is held to be a sale, alternatively contends that the fair market value of Allis Corporation's stock was less than the $325 per share paid by Trianon, and that Allis, Shanberg, and Woolf received taxable dividends measured by the difference between the purchase price and the fair market value of the stock at the time of the transfer under section 22 (a).

Under the first of respondent's contentions, he argues that the transaction was merely a device by which Allis, Shanberg, and Woolf obtained a distribution of earnings and profits from Trianon at capital gain rates. It is true, as respondent contends, that the facts show that these taxpayers owned substantially controlling interests in Allis Corporation and Trianon; that despite the distribution to them of $1,934,725, their substantial control over the assets of the corporation whose stock they surrendered remained essentially the same; that the taxpayers, as majority shareholders, could have had Trianon declare a dividend payable out of its accumulated surplus at any time; and that Trianon had surplus which would have amply covered the distribution it made to the shareholders. The facts as enumerated above, however, do not serve to differentiate the present case from prior decisions which have held, on facts similar to those in the present case, that such transactions are sales, and the proceeds received by the selling shareholders are taxable as capital gains. Cf. *Rodman Wanamaker Trust*, 11 T. C. 365, affd. 178 F. 2d 10; *Emma Cramer*, 20 T. C. 679; *Commissioner* v. *Pope*, 239 F. 2d 881, affirming T. C. Memo. 1956–41.

In the *Wanamaker* case, *supra*, the petitioner was the controlling

shareholder of John Wanamaker Philadelphia. John Wanamaker Philadelphia owned all of the capital stock of John Wanamaker New York. In each of 3 years, John Wanamaker New York purchased some of the shares of stock of its parent from the controlling shareholder at a price approximately the book value of the shares. The purpose of the transaction was to provide the shareholder, a trust, with the funds necessary to enable it to make distributions to its beneficiaries. This Court considered the applicability of section 115 (g), which treats a distribution by a corporation, in redemption of its stock, as a taxable dividend to the extent it is made out of earnings and profits, where the distribution is "essentially equivalent to the distribution of a taxable dividend." The Court held that section 115 (g) is inapplicable where a corporation does not redeem its own stock.

In the *Cramer* case, *supra*, the petitioners owned all the stock of the Radio Condenser Company, Western Condenser Company, S. S. C. Realty Company, and Manufacturers Supply Company. Radio Condenser Company purchased all the stock of the other three corporations for amounts equal to the appraised fair market value of the stock, less liabilities. We held that the amounts received by petitioners were not taxable as dividends within the meaning of 115 (a) or 112 (c), for the following reasons, which are equally applicable to the present case:

Section 115 (a) defines a dividend as any distribution by a corporation to its shareholders made out of earnings and profits. An arrangement whereby the stock of one corporation is sold to a related corporation by its shareholders might be "essentially equivalent" to a dividend, although it does not have the attributes of the formal dividend contemplated by section 115 (a). Section 115 (g) was originally enacted, and amended in 1950, to remedy the limited application of section 115 (a). If the scope of section 115 (a) was broad enough to include corporate surplus distributions not in the form of legal dividends, the original section 115 (g), and its subsequent amendment, would have been unnecessary. Nor can such a distribution fall within the ambit of section 112 (c) (2), which provides dividend treatment for a distribution which has "the effect of the distribution of a taxable dividend," to the extent of the recipient's share of undistributed earnings and profits, if the distribution was part of a reorganization plan contemplated by section 112 (c) (1). Section 112 (c) (1), in turn, applies only to those exchanges within section 112 (b) (1), (2), (3), or (5). Respondent only relied upon section 112 (b) (3) (as he does in the present case), which covers the "stock for stock" exchange. He invoked this provision on the ground that the selling shareholders already owned stock in the purchasing corporation and, therefore, the net result was the same as an exchange of stock for stock. Such a construction creates a fiction which strains the language of section 112 (b)

(3) to a point where any number of transactions, which this section was not intended to cover, would be snared in its web.

The *Wanamaker* and *Cramer* cases were decided prior to the operation of 115 (g) (2), which was added by the Revenue Act of 1950 "to cover indirect redemption of shares in a parent corporation through purchases by its subsidiaries." H. Rept. No. 2319, 81st Cong., 2d Sess., p. 53. However, a provision which would have expressly extended the "essentially equivalent to a dividend" test of section 115 (g) to transactions involving corporations controlled directly or indirectly by the same interests was rejected by Congress. S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 42, 43. The substance of section 115 (g) was not extended to include cases of so-called "brother-sister" corporations until section 304 of the Internal Revenue Code of 1954 was enacted. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 239.

The fact that Congress did not extend the application of section 115 (g) to the factual situation before us in the present case, until enactment of the 1954 Code, though it considered the problem twice prior to that, makes it apparent that under prior existing law, section 115 (g) does not apply to transactions between brother-sister corporations. Respondent's argument in the present case, based on this section, must therefore fail because of the principles established by *Wanamaker* and *Cramer*. Cf. *Commissioner* v. *Pope, supra*.

We have carefully considered respondent's request that, if we find the principles of *Wanamaker* and *Cramer* applicable to the facts in this case, which we do, we overrule the prior decisions. We see no reason to depart from the established precedent. Respondent, in making his request, relies on our decision in *William M. Liddon*, 22 T. C. 1220, affirmed on this issue 230 F. 2d 304, certiorari denied 352 U. S. 824, but we feel that this case is distinguishable on its facts.

In the *Liddon* case, the shareholders of Liddon Motors, Inc., adopted a plan of liquidation. Petitioner formed Liddon Pontiac, Inc., acquiring all of its stock for a capital contribution of $125,000, and 5 days later the new corporation purchased a portion of the assets of the old corporation. The old corporation was dissolved within a short period of time, and its assets were distributed to petitioners. We held that the liquidating distribution was made under a 112 (b) (3) reorganization, and, therefore, had the effect of a taxable dividend under section 112 (c) (1). We there viewed all the transactions as one integrated reorganization plan. In so doing, it became apparent that petitioners literally came under the statutory language, i. e., before the execution of the series of transactions, petitioners had stock in the old corporation, while afterward, they had stock in the new corporation with "money-to-boot."

Though the facts of the *Liddon* case are distinguishable from the facts of the present case in many aspects, it will suffice to say that

Allis, Shanberg, and Woolf did not acquire stock in Trianon as a result of any of the transactions here in issue and, thus, as we have noted above, by no stretch of the imagination can the situation before us be viewed as an exchange of stock for stock within section 112 (b) (3).

Addressing ourselves briefly to the contention that there was no business purpose for the purchase of Allis Corporation's stock by Trianon, and that the transaction was a sham, we find no evidence in the record which indicates a spurious transaction between Allis, Shanberg, and Woolf, and Trianon. Many credible business reasons for operating the Allis Hotel and the Hotel Muehlebach as one corporate entity were offered by petitioners. That such an object could have been attained by other routes is not material. Taxpayers are not required to shun available statutory routes that minimize taxes. *Commissioner* v. *Pope, supra.*

Respondent's alternative argument is that any excess of purchase price over fair market value of Allis Corporation's stock received by Allis, Shanberg, and Woolf, constitutes a taxable dividend to them under section 22 (a). Respondent's argument is based on the principles laid down in Regulations 111, section 29.22 (a)–1; and this Court has taken a similar position. *Jacob M. Kaplan*, 21 T. C. 134.

Allis, Woolf, and Shanberg contend, however, that the fair market value of Allis Corporation's stock, on the date of its transfer to Trianon, was $325 per share, or what Trianon paid for the stock. Respondent contends that the fair market value of the stock on that date was not in excess of $212 per share. Respondent arrived at this figure by capitalizing Allis Corporation's earnings from 1941 through 1950 at the rate of 7½ per cent.

Our study of the testimony and of all the facts and circumstances pertaining to Allis Corporation leads us to the conclusion that the earnings of that company from 1941 through 1950 do not furnish any reliable criterion for the fair valuation of the stock in question. During World War II and the postwar years, Wichita grew in commercial importance, and the Hotel Allis shared in the fruits of that growth, because it occupied a centrally located position which provided easy access to the business area of the city. In the 5-year period, 1947 through 1951, Allis Corporation's earnings before taxes reached a high of $338,240.65, and did not fall lower than $281,051.42; whereas, in the earlier years which figured in respondent's computation, Allis Corporation's annual earnings were as low as $60,210.55, and did not exceed $244,472.76.

This is not to say that earnings are not a factor to be considered in ascertaining the fair market value of stock. However, it is our opinion that the 5-year period, 1945 through 1949, is more indicative of the earning potentialities of Allis Corporation. Just such a period was used by one of the auditors of Allis Corporation in determining the

value of Allis Corporation's properties for purposes of advising a prospective buyer as to what would constitute a fair offer for all of the stock of Allis Corporation. The earnings for this period were capitalized by 7½ per cent, which was the capitalization rate also used by respondent. The valuation arrived at was in the amount of $2,100,000, or approximately $288.50 per share. This valuation was made sometime in 1950.

In estimating the value of common stock of a corporation having few or no sales to establish a fair market value, the value of the net assets of the corporation also has an important bearing. *Oxford Paper Co.* v. *United States*, 52 F. 2d 1008. In the latter part of 1951, and in early 1952, Trianon had appraisals made of the assets which it acquired from Allis Corporation. Generally, the valuation was ascertained by computing an asset's estimated replacement cost less depreciation of a percentage equal to the used-up portion of the asset's probable useful life, determined by present physical condition. These computations were made by qualified appraisers. The total appraised value of the acquired tangible assets and leaseholds, plus the book value of the acquired current assets, less assumed liabilities, amounted to $2,507,221.92, or approximately $347.90 per share.

In addition to the above valuations, evidence was submitted showing that prior to the transaction here in issue, Allis Corporation's shareholders received several informal offers to purchase all of their stock. These offers ranged from $277.43 to $319.05 per share. Though such offers can be given little weight by themselves, when compared with the value of the stock, as computed by both the capitalized-earnings and appraised-underlying-assets methods, such evidence tends to support the conclusion that the ultimate price of $325 per share, which Trianon paid for Allis Corporation's stock, represented fair market value.

Upon all the evidence, it is our conclusion that the stock of Allis Corporation had a fair market value equivalent to the $325 per share paid by Trianon.

It is therefore held that the transaction by which Allis, Shanberg, and Woolf transferred all their shares of stock in Allis Corporation to Trianon, and received a total of $1,934,725, consisting of cash and notes, constituted a sale of stock to Trianon, and the total amount received by Allis, Shanberg, and Woolf represented the sales proceeds in payment for their stock. It is held that the proceeds are taxable as long-term capital gains.

As a result of our holding under this question, it is unnecessary to consider contentions of the petitioners relating to the burden of proof with respect to matters raised by respondent's amendments to his answers.

The second question involves determination of the proper basis to petitioner for depreciation and amortization of the assets acquired upon the liquidation of Allis Corporation on December 31, 1951. Trianon contends that its basis for all of the assets is to be measured by the amount which Trianon paid for the stock of Allis Corporation, namely, $2,342,925. The respondent contends that the purchase of the stock of Allis Corporation and the subsequent liquidation of that corporation falls within the ambit of section 112 (b) (6), 1939 Code, so that Trianon's basis for the assets is the same as the basis in the hands of Allis Corporation at the time of the liquidation under section 113 (a) (5), namely, $1,067,481.29.

If Trianon is to prevail, it must be established that the purchase of Allis Corporation's stock on December 7, 1950, and the subsequent liquidation of that corporation on December 31, 1951, did not constitute two separate and unrelated transactions. That is to say, it must be shown that the assets of Allis Corporation were not acquired in complete liquidation of that corporation within the meaning of section 112 (b) (6), 1939 Code, because in such case, Trianon would be required to use its transferor's basis as is prescribed by section 113 (a) (15). If petitioner is to prevail, it must be established that the purchase of Allis Corporation's stock, and the subsequent liquidation of Allis Corporation, constituted, in substance, one integrated transaction in which Trianon intended to purchase Allis Corporation's assets. See *Commissioner* v. *Ashland Oil & R. Co.*, 99 F. 2d 588; *Koppers Coal Co.*, 6 T. C. 1209; *Kimbell-Diamond Milling Co.*, 14 T. C. 74, affirmed per curiam 187 F. 2d 718, certiorari denied 342 U. S. 827; *Kanawha Gas & Utilities Co.* v. *Commissioner*, 214 F. 2d 685; *Montana-Dakota Utilities Co.*, 25 T. C. 408.

It is not necessary for us to review the facts and conclusions of the above-cited cases. In each case it appeared that a corporation had as its primary purpose the purchase of the assets of another corporation, but was forced by the selling shareholders to effect the asset acquisition by first acquiring stock and then liquidating the acquired subsidiary. In the cited cases, an important factor was that the acquiring corporation had no intention of merely continuing the business of the old corporation in a new corporate form. This Court has held that the principles enunciated by the foregoing cases do not apply when the acquiring corporation does not intend to integrate the acquired assets into its own operations. *John Simmons Co.*, 25 T. C. 635.

Upon a careful examination of the entire record, we are compelled to conclude that Trianon did not have as its primary purpose in purchasing Allis Corporation's stock the acquisition of the assets of that corporation. It is true, as Trianon contends, that the minutes

of its board of directors' meeting on December 5, 1950, authorized the purchase of Allis Corporation's stock and clearly set forth an intent to subsequently liquidate Allis Corporation to acquire the assets. It is true also that Trianon did not deviate from such expressed intention. However, we are not dealing here with unrelated corporations. Trianon and Allis Corporation were, in substance, related corporations prior to the transactions here in issue, by virtue of the controlling interests in both corporations held by Allis, Shanberg, and Woolf. Without disregarding the two separate corporate entities, or attacking the substance of the sale of stock by the Allis shareholders to Trianon, we must still be cognizant of the realities of the situation before us. That is, we cannot help being aware of the opportunities available to maneuver the steps taken by both corporations to give the appearance of carrying out an expressed intention, without actually doing so. In such a case, we are of the opinion that careful scrutiny must be given to what the acquiring corporation ultimately does with its acquisition, in order to make sure that more was accomplished than the mere changing of the corporate name.

For example, an examination of the testimony discloses certain facts which tend to negate the self-serving declaration of intention in the minutes of Trianon's board of directors' meeting. Allis testified that when he discussed certain proposals made by outside interests to purchase the stock of Allis Corporation, both Woolf and Shanberg expressed a desire to convert their stock into cash or securities in order to put their estates in a more liquid condition.

Woolf, in his testimony, agreed that he wished to get his estate more liquid so that it could meet possible inheritance and estate tax liabilities. When asked whether he participated in the discussions and decisions of the Trianon board of directors with respect to the advisability of Trianon's purchasing the Allis Corporation stock, Woolf answered, "Well, as Mr. Allis put [it] up to us, it had become profitable, very profitable, and I was trying to get as liquid as possible all the time, so I O. K.'d it." Woolf also stated that Shanberg was concerned about the liquidity of his estate.

Trianon's board of directors consisted of five men in 1950: Allis, Woolf, Shanberg, D. H. Sheffrey who was Trianon's attorney, and James M. Kemple who was chairman of the board of directors of the Commerce Trust Company of Kansas City, Missouri.

The above-mentioned facts create a strong inference that Trianon's board of directors considered purchasing Allis Corporation's stock in order to convert such stock into liquid assets, without depriving the majority shareholders of their control over the operations of the latter corporation. Such an intention suggests that the purchase of

stock was not to acquire assets, but to supply certain of Allis Corporation's majority shareholders with readily available funds which would not be depleted by a dividends tax.

In making our determination, however, we rely mainly on the conclusion that Trianon did not acquire a group of assets when it purchased Allis Corporation's stock and subsequently liquidated that corporation, but a separate, going business. The record before us shows no change of any importance in the operation of the Allis Corporation properties after Trianon took them over. Business continued as usual; the properties continued to be operated in the same manner, owned by substantially the same shareholders, and managed by substantially the same major officers in Trianon's hands as they were in Allis Corporation's hands. It might also be added that Allis and Woolf constituted a majority of the 3-man board of directors of Allis Corporation, while Allis, Woolf, and Shanberg constituted a majority of the 5-man board of directors of Trianon after Allis Corporation's liquidation. Thus, the policy decisions regarding the operation of the acquired properties were entrusted to substantially the same guiding forces as they were when they were held by Allis Corporation.

It is our ultimate finding, therefore, that it was, in truth and in fact, the desire of the individuals who actually conducted the business of Trianon to continue unchanged the business of Allis Corporation. Such purpose is incompatible with the alleged intention to acquire assets. *John Simmons, supra.*

It is held that the purchase of the stock of Allis Corporation and the subsequent liquidation of that corporation by Trianon were not integrated steps leading to the purchase of assets by Trianon; Trianon must be deemed to have acquired the properties of Allis Corporation by liquidating a wholly owned subsidiary; and under section 113 (a) (15), the basis of the properties to Trianon is the same as in the hands of Allis Corporation.

In its corporation income tax return for 1952, Trianon allocated among the assets acquired by it on liquidation of Allis Corporation the sum of $1,912,414.52 to depreciable assets, the sum of $53,925.43 to amortizable assets, and $376,585.05 to other nondepreciable assets, and it claimed deductions for depreciation and amortization on such stepped-up basis. Respondent in his notice of deficiency determined that the basis of the assets of Allis Corporation to Trianon for depreciation and amortization purposes is the same as the basis in the hands of Allis Corporation as of December 31, 1951, namely, book value, increased by 17.4226662 per cent in the amount of $222,216.29,

which was allocated ratably among the assets received by Trianon. The percentage, 17.4226662, represented the minority stockholder interests in Allis Corporation not owned by the controlling stockholders, Allis, Shanberg, and Woolf. In its petition (in Docket No. 60338), petitioner alleges that it is entitled to depreciation and amortization deductions based upon the stepped-up basis of the assets claimed in its return for 1952. Prior to the trial, respondent filed an amendment to his answer in which he affirmatively alleged that he had erroneously increased the basis of the assets by 17.4226662 per cent, resulting in an erroneous allowance of deductions for depreciation and amortization for 1952 in the amounts of $12,865.19 and $121.92, respectively, and he claimed an increased deficiency in income tax resulting from such adjustments. All allegations of fact in the amendment to the answer were denied in the reply filed by petitioner. At the trial respondent introduced evidence showing the basis of the assets in the hands of Allis Corporation as of December 31, 1951, and the proper amounts of deductions for depreciation and amortization for 1952 based on the theory that the assets of Allis Hotel which were acquired by petitioner retained the same basis they had in the hands of Allis Corporation as of December 31, 1951, under sections 112 (b) (6) and 113 (a) (15), 1939 Code.

It is concluded that respondent has met the burden of proof imposed upon him under the affirmative allegations made in the amendment to the answer.

In view of the above holdings, it is not necessary to consider other contentions of the respondent.

It has been held above that Trianon acquired the assets of Allis Corporation in a complete liquidation of Allis Corporation. See sec. 112 (b) (6). Trianon qualifies as an "acquiring corporation" as defined by section 461 (a) (2), and may compute its excess profits credit under part II of the Excess Profits Tax Act of 1950, as amended. It is so held. All of the necessary excess profits tax adjustments will be made under Rule 50.

The parties are agreed that certain adjustments are to be disposed of under Rule 50 computations.

*In Docket Nos. 60338, 60341, and 63700, decisions will be entered under Rule 50.*

*In Docket No. 60339, decision will be entered for petitioner.*