Tom Coke Connally and Estate of Mary Evelyne Connally, Deceased, Tom Coke Connally, Community Survivor and Sole Legatee v. Commissioner.
Connally v. Commissioner
Docket No. 80931.
United States Tax Court
T.C. Memo 1961-312; 1961 Tax Ct. Memo LEXIS 38; 20 T.C.M. (CCH) 1613; T.C.M. (RIA) 61312; November 14, 1961
Jim F. Fullingim, Jr., Esq., for the petitioners. Harold A. Chamberlain, Esq., for the respondent. WITHEY
Memorandum Findings of *39 Fact and Opinion WITHEY, Judge: The respondent has determined a deficiency of $28,144.31 in the income tax of the petitioners for 1954. The issues for determination are the correctness of the respondent's action (1) in determining that the proceeds received by the petitioners in 1954 from the sale of shares of stock in one corporation to another corporation, each of which was controlled by petitioners, constituted a dividend taxable as ordinary income; and (2) in disallowing a deduction of $720 taken by petitioners for entertainment and other expenses. Findings of Fact Some of the facts have been stipulated and are found accordingly. Tom Coke Connally, sometimes hereinafter referred to as petitioner, and Mary Evelyne Connally were husband and wife prior to her death on November 29, 1956, and had their principal place of residence in Amarillo, Texas. They filed their joint Federal income tax return for 1954 with the district director in Dallas, Texas. In 1954 petitioners owned stock in two corporations which they controlled, namely, Connally Bearing Company, sometimes hereinafter referred to as Bearing Company, and Connally Implement Supply Company, sometimes hereinafter referred *40 to as Implement Company. Bearing Company was organized in September 1946, and its place of business at 816 Grant in Amarillo and was engaged in the business of selling bearings and accessories. Implement Company was organized in January 1951, had its place of business at 404 Grant in Amarillo, and was engaged in the business of selling farm implements and equipment. The merchandise handled by Implement Company was of different character from and was not a duplication of that handled by Bearing. The outstanding capital stock of Bearing Company and Implement Company on January 1, 1954, was owned as follows: Bearing
Implement
Company
Company
Shares
Shares
Petitioners
498
187
J. P. Moore
1
10
F. J. Davis
1
Carl Hill, Jr.
53
Total
500
250
Due to a serious drought in the agricultural growing regions of southwest Texas, the sales and net income of Implement Company declined drastically during 1953 and its operations resulted in a substantial net loss for that year. As a result several discussions occurred during the latter part of 1953 and the early part of 1954 between the officers and stockholders of Bearing Company and those of Implement *41 Company respecting the financial difficulties of Implement and the measures which might be taken to reduce its current operating losses and to finance its future operations if it were to continue business. Several economy measures were adopted including the moving of Implement into the same building that was occupied by Bearing. Following further discussions between the officers and stockholders of Bearing Company and those of Implement Company it was concluded that the business conducted by Implement likely would become profitable again after the drought and the effects thereof had ended and that Bearing was strong enough financially to provide Implement with the financial assistance it would need until such time as it again could operate profitably. Accordingly, following the suggestion of Carl Hill, Jr., who was general manager of both corporations and secretary and treasurer of Implement Company, it was decided by the officers and stockholders of Implement that the best solution of the difficulties facing them and that corporation would be to sell their stock in it to Bearing. The petitioner was of the opinion that the business of Implement likely would become profitable again *42 upon the termination of the drought and its effects, that Bearing would be able to furnish Implement the financial assistance it would need until its operations again became profitable and that the purchase of the stock would eventually prove to be a profitable investment for Bearing. Accordingly, he as president of Bearing entered into an oral contract during March 1954 with the stockholders of Implement for Bearing to purchase all of the capital stock of Implement for $60,000, the approximate book value of the stock at that time, with the sale to be consummated on or about September 10, 1954. That time was selected for the consummation of the sale because Bearing usually was in its best condition cashwise at the end of the summer. After the foregoing contract was entered into the salaries of two of the officers of Implement Company were discontinued. On June 8, 1954, the petitioner on behalf of Bearing Company wrote The Broyhill Company, Dakota City, Nebraska, a company from which Implement Company made about 40 percent of its purchases of merchandise, stating that Bearing had completed an agreement to purchase Implement Company. Pursuant to the contract entered into by them *43 and Bearing Company in March 1954 all of the stockholders in Implement Company on September 10, 1954, delivered to Bearing their certificates for stock in Implement which they previously had endorsed. Following the delivery of the foregoing certificates to it, Implement issued one certificate for all of the stock (250 shares) in the name of Bearing and delivered the certificate to it. On September 10, 1954, Bearing Company issued directly to the designated payees checks as follows in payment for their shares of stock in Implement Company: Check No.
Payee
Amount
32,400
Carl Hill, Jr.
$12,720
32,402
J. P. Moore
2,400
32,403
Tom Coke Connally
44,880
Total
$60,000
On October 21, 1954, the petitioners sold the following number of shares of stock in Bearing Company to the indicated persons for the amounts shown: No. of
Shares
Sold to
Amount
27
Carl Hill, Jr.
$12,720
5
J. P. Moore
2,400
Bearing Company changed its name to Implement Company effective August 31, 1955, and on that date Implement Company was dissolved. The following is a statement of the net income or net loss of Implement Company for the indicated years: *44 Net Income or
Taxable Year Ended
(Net Loss)
December 31, 1951
$24,085.88
December 31, 1952
21,029.01
December 31, 1953
(8,710.81)
December 31, 1954
14,635.97
August 31, 1955
(220.36)
The fair market value of the stock of Implement Company in March 1954 was $240 per share. In determining the deficiency here involved the respondent determined that the transfer by petitioners on September 10, 1954, to Bearing Company of their 187 shares of stock in Implement Company constituted an acquisition of the stock by a related company and that the amount of $44,880 received by petitioners from Bearing following their transfer to it of their stock in Implement constituted a redemption of such stock and was taxable as a dividend to petitioners. The $44,880 received by the petitioners as a result of the sale of their stock in Implement Company did not constitute a dividend to them but represented the proceeds of a sale taxable to them as longterm capital gains. Opinion Taking the position that under the provisions of section 304(a)(1) [1] and related provisions of the Internal Revenue Code of 1954 the petitioners' sale of their stock in Implement Company to Bearing *45 Company on September 10, 1954, constituted a redemption of such stock, that such redemption was a distribution of property of the value of $44,880, and that such distribution was taxable to the petitioners as a dividend, the respondent contends that his determination should be sustained. The respondent contends that no contract or agreement for the sale of the stock in Implement was entered into by the stockholders of Implement prior to June 22, 1954, the effective date, as originally enacted in section 391, of the provisions of the Code relied on by respondent. The petitioners contend that the contract for the sale of the stock in Implement was entered into in March 1954 and therefore prior to June 22, 1954, that section 22 of the Technical Amendments Act of 1958 [2] amended section 391 of the Code so as to make the provisions of the Code of 1939 applicable to acquisitions of stock occurring on or after June 22, 1954, and on or before December 31, 1958, pursuant to a contract entered into prior to June 22, 1954, and that accordingly under the holdings in Trianon Hotel Co., 30 T.C. 156 (1958), and Emma Cramer, 20 T.C. 679 (1953), the proceeds received by them *46 from the sale of their stock in Implement were not dividends but proceeds from the sale of a capital asset held for more than 6 months.
*47 Section 22 of the Technical Amendments Act of 1958 makes it clear that where, pursuant to a contract entered into prior to June 22, 1954, an acquisition of stock described in section 304 of the Code of 1954 occurred on or after June 22, 1954, and on or before December 31, 1958, the extent to which the property received in return for such acquisition shall be treated as a dividend shall be determined under the Code of 1939 and as if the Code of 1954 had not been enacted. In support of his contention that no contract or agreement for the sale of the stock in Implement Company was entered into by the stockholders of that company and Bearing Company prior to June 22, 1954, the respondent urges that certain portions of the record indicate that it was the intention of the stockholders of Implement as well as of Bearing that the latter's purchase was to be of Implement Company or its assets and not of its stock. As was pointed out in Nellie S. Alexander, 36 B.T.A. 929, 932 (1937), the Supreme Court in Insurance Co. v. Dutcher, 95 U.S. 269 (1877) said: The practical interpretation of an agreement by a party to it is always a consideration of great weight. The *48 construction of a contract is as much a part of it as anything else. There is no surer way to find out what the parties meant, than to see what they have done. * * * Here, in consummating the contract entered into by them in March 1954, the stockholders of Implement delivered the certificates for their stock in that company to Bearing and the latter in turn paid them therefor the total sum of $60,000 as originally agreed. Thereafter the certificates were delivered to Implement which in turn issued one certificate in the name of Bearing for the total number of shares, 250, and delivered it to Bearing. From a consideration of the record as a whole we are satisfied that the intention of the parties to the contract was for the sale by the stockholders of Implement and the purchase by Bearing of the shares of stock in Implement and have found that the contract was for the sale and purchase of such shares. Having so found we hold that the question of whether the payment of $44,880 by Bearing Company for the stock of the petitioners in Implement Company constituted a distribution in redemption of the stock essentially equivalent to the distribution of a taxable dividend is to be determined *49 under the Code of 1939 and as if the Code of 1954 had not been enacted. Section 115(a) of the Code of 1939 defines a dividend as any distribution by a corporation to its shareholders made out of its earnings or profits accumulated after February 28, 1913, or out of the earnings or profits of the taxable year. Section 115(g)(1) provides that if a corporation cancels or redeems its stock at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend. Trianon Hotel Co., supra, arose under the Code of 1939. There three individuals by reason of their stockholdings in two corporations were in control of the corporations. One of the corporations operated a hotel situated in one city, the other corporation operated a hotel situated in another city. For the purpose of having the hotels operated as a single corporate entity, the individuals sold their *50 stock in one corporation to the other corporation. A question there presented was whether under the provisions of section 115(g)(1) the amounts received by the individuals for their stock were essentially equivalent to a taxable dividend. After considering the question at length, including the decisions of this and other courts bearing thereon, we concluded that the provisions of section 115(g)(1) were inapplicable to sales transactions involving the stock of "brother-sister" corporations, that the amounts received by the individuals represented sales proceeds received in payment for their stock, and that such proceeds were taxable as long-term capital gains. Here the prevailing drought with its attendant unfavorable effects on the business and income of Implement Company, together with Implement's need for financial assistance if it were to continue business, prompted the sale by its stockholders of their stock to Bearing Company which was able to furnish it financial assistance. That was sufficient to provide economic reality for the sale of the stock and give it a business purpose. Being of the opinion that our holding in Trianon Hotel Co., supra, is applicable and *51 controlling here, we hold for the petitioners on this issue. In their income tax return the petitioners took a deduction of $720 which was explained as "Customers' entertainment (in earning salary) tips and other expenses." The respondent disallowed the deduction. In their petition the petitioners assigned error as to the respondent's action and in their allegation of facts in support of their assignment of error stated: During the year Petitioners spent small sums for travel and entertainment which were not reimbursed by the company and which were claimed on their tax return. These small expenses covered meals, coffee, tips, taxi fare and entertainment to customers. In his answer the respondent denied the assignment of error and the allegation of facts. With respect to the deduction taken, the petitioner testified that during 1954 he made expenditures for various customers' entertainment, lunches, dinners, beverages, and taxi fares for which he was not reimbursed by "the company," which was not otherwise designated, that he kept no record of such expenditures, and that his estimate of the amount thereof was between $900 and $1,000. In their income tax return the petitioners *52 reported salaries of $27,000 and $3,000 as having been received from Bearing Company and Implement Company, respectively. The petitioners relying on Cohan v. Commissioner, 39 F. 2d 540, take the position that, since petitioner testified he had expended between $900 and $1,000 for the above-mentioned purposes, the deduction of $720 should be allowed. The petitioners' reliance on Cohan v. Commissioner appears to be misplaced. As we understand the contention of the petitioners they are not seeking to deduct the amount in question on the ground that it was incurred in a trade or business carried on by them but on the ground that it was incurred by them in behalf of "the company," whether Bearing or Implement is not disclosed, which did not reimburse them therefor. There is no showing that the petitioner or the petitioners were required by any agreement with either Bearing or Implement to make expenditures of the character here involved in behalf of either company. Nor is there any explanation as to why the petitioners were not reimbursed for the expenditures in question, particularly since they were in control of both Bearing and Implement throughout 1954. In this state *53 of the record and since a taxpayer may not make voluntary payment of the expenses of another and be allowed a deduction therefor in his own return, the respondent's action as to this issue must be sustained for lack of proof to show error. Decision will be entered under Rule 50. Footnotes
1. SEC. 304. REDEMPTION THROUGH THE USE OF RELATED CORPORATIONS. (a) Treatment of Certain Stock Purchases. - (1) Acquisition by Related Corporation (Other than Subsidiary). - For purposes of sections 302 and 303, if - (A) one or more persons are in control of each of two corporations, and (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control, then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation. ↩
2. SEC. 22. CERTAIN ACQUISITIONS OF STOCK. (a) Transitional Rules. - Section 391 (relating to effective date of certain provisions of the Internal Revenue Code of 1954 relating to distributions by corporations) is amended by adding at the end thereof the following new sentence: "In the case of - "(1) any acquisition of stock described in section 304 which occurred before June 22, 1954, and "(2) any acquisition of stock described in such section which occurred on or after June 22, 1954, and on or before December 31, 1958, pursuant to a contract entered into before June 22, 1954, the extent to which the property received in return for such acquisition shall be treated as a dividend shall be determined as if the Internal Revenue Code of 1939 continued to apply in respect of such acquisition and as if this Code had not been enacted." (b) Effective Date. - The third sentence of section 391 of the Internal Revenue Code of 1954↩, as added by subsection (a) of this section shall apply as if included in such section on the date of the enactment of such Code.