WILLIAM E. GATLIN and MARILYN B. GATLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAMES M. WINGE and WILLIE B. WINGE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gatlin v. Commissioner
Docket Nos. 9760-77, 9761-77.
United States Tax Court
T.C. Memo 1982-489; 1982 Tax Ct. Memo LEXIS 252; 44 T.C.M. (CCH) 945; T.C.M. (RIA) 82489; August 25, 1982. *252 Held, fair market value of unlisted stock contributed to charity determined. Robert S. Bolt,Leslie J. Barnett, and Jacob I. Reiber, for the petitioners. Roger D. Osburn, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Addition to Tax
Sec. 6653 (a)
Petitioner
Year
Deficiency
[1] I.R.C. 1954 William E. and Marilyn B. Gatlin
1973
$ 9,112.73
$455.64
1974
15,973.46
798.67
1975
14,224.22
2,356.36
James M. and Willie B. Winge
1973
$15,000.00
$750.00
1974
15,000.00
750.00
1975
12,750.00
638.00
*253 After concessions by the Commissioner and Dr. and Mrs. Gatlin, the issue for decision is the fair market value of shares of stock in a closely held corporation which the petitioners contributed to various charities in 1973, 1974, and 1975. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Dr. William E. and Marilyn B. Gatlin, husband and wife, were legal residents of Tampa, Fla., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1973, 1974, and 1975 with the Internal Revenue Service Center, Chamblee, Ga. The petitioners, James M. and Willie B. Winge, husband and wife, were legal residents of Tampa, Fla., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1973, 1974, and 1975 with the Internal Revenue Service Center, Chamblee, Ga. In 1970, Insurex Corporation (Insurex) was incorporated under the laws of Florida. Since that time, it has continuously and actively engaged in the business of conducting *254 paramedical physical examinations of individuals who desire to purchase life and health insurance and of providing reports of such examinations to life and health insurance companies which use such examinations in the course of underwriting and issuing insurance policies. Such examinations were performed by trained individuals, e.g., registered nurses, for a standardized fee and in a standardized manner without the presence of a physician. During 1970 through 1975, an Insurex examination cost between $11 and $15, depending on the type of examination given. The results of such examinations were promptly forwarded to the insurance companies which were considering insuring the individuals who were examined. For the insurance companies and their agents trying to obtain an examination of a proposed insured, such examinations were generally less expensive, more convenient, and the results could be secured more promptly than physician-conducted examinations. During the years in issue, Insurex maintained its principal office in Tampa, Fla.
The eight original stockholders of Insurex (the founders) were Mr. Winge, Dr. Gatlin, Dr. Jeno E. Szakacs, Dr. Harold L. Sanders, Charles H. Guy, *255 Jr., James K. Murray, Jr., T. K. Knight, and Trevor G. Smith. All of the founders resided and conducted their medical practices or businesses in Tampa: Mr. Knight was a mortgage broker and businessman, Mr. Guy was a life insurance agent and businessman, Mr. Murray was a life insurance agent and businessman, Mr. Smith was a group insurance sales manager for Bankers Life of Nebraska and a businessman, Mr. Winge was a general life insurance agent in charge of several offices in Florida of Bankers Life of Nebraska, Dr. Gatlin was Chief of Radiology at St. Joseph's Hospital, Dr. Szakacs was Chief of Pathology at St. Joseph's Hospital, and Dr. Sanders was Chief of Surgery at Tampa General Hospital. At or about the time of the incorporation of Insurex, each of the founders purchased 10 shares of Insurex's sole class of capital stock at a cost of $10 per share. The paramedical examination concept originated in 1967 and was implemented in 1968 by a St. Louis, Mo., physician. In 1969, such individual sold the company established by him to Lincoln National Insurance Corporation. The founders of Insurex hoped to capitalize on the paramedical examination concept and the growing national market *256 for life insurance in general. They hoped to convince life insurance companies to accept paramedical examinations in lieu of physician-conducted examinations and to have such companies recommend that their agents use Insurex's services. Through their expertise in the medical profession, in the marketing of life insurance, and in management, the founders hoped to develop Insurex into a national company which could eventually either be taken public or sold to a large national corporation. In July 1970, each of the founders purchased an additional 30 shares of Insurex stock at a price of $10 per share. Also in July 1970, Insurex hired Scott E. Wilson as its executive director. Mr. Wilson's compensation was $700 per month, and he was given an option to purchase Insurex shares equal to the number of shares owned by each of the founders at a price of $10 per share. In January 1971, pursuant to such option, Mr. Wilson purchased 40 shares of Insurex stock at $10 per share. Before his employment by Insurex, Mr. Wilson was an operating room technician. In September 1970, Insurex obtained a $25,000 line of credit with First National Bank of Tampa (FNBT), and draws were made against such *257 line of credit for working capital. The founders jointly and severally guaranteed this line of credit. In December 1970, such line of credit was increased to $50,000, and in May 1971, it was increased to $100,000. The founders guaranteed such increases. In December 1970, Mr. Guy, who was one of the directors of Insurex, was hired as its president at a salary of $33,000 per year. As an inducement for Mr. Guy to take such position, the directors of Insurex authorized him to purchase an additional 67 shares of Insurex stock at $10 per share. On January 13, 1971, Mr. Guy purchased such 67 shares, making him the largest shareholder of Insurex stock. In conjunction with the hiring of Mr. Guy, Insurex purchased a life insurance policy on his life in the amount of $100,000. Insurex was the owner and beneficiary of such policy. In January 1971, Insurex's articles of incorporation were amended to authorize the issuance of 1 million shares of capital stock at a par value of 1 cent per share. The board of directors of Insurex then approved an 800-for-1 stock split, and such stock split was effectuated. After such split, each of the founders had a cost basis in his Insurex stock of 1.25 *258 cents per share. During 1971, Insurex made two offerings of its stock to residents of Florida. The purpose of such offerings was to raise additional capital to finance the expansion of Insurex. The first 1971 offering, which was completed by June 25, 1971, consisted of 16,000 shares at a price of $5 per share. The second 1971 offering, which was made between July 26 and October 15, 1971, consisted of 6,670 shares at a price of $7.50 per share. The following table contains information regarding the first and second 1971 offerings: First 1971 Offering
Number of
Purchaser
Date of Purchase
Shares
Total Amount
Gatlin, Stearn & Drake, P.A.,
Pension Trust
2/12/71
1,800
$ 9,000
Robert J. Dew, Jr.
3/ 9/71
3,000
15,000
Wm. G. Taylor, M.D., P.A.
Pension Trust
3/10/71
1,800
9,000
Patricia A. Frank
4/12/71
1,000
5,000
Szakacs, Davis & Biemer, P.A.,
Profit-Sharing Trust
4/13/71
1,800
9,000
Ralph Jensen Radiotherapy, P.A.,
Profit-Sharing Plan
5/ 7/71
1,800
9,000
T. Emmett Anderson, Jr.
5/17/71
1,800
9,000
Roger Kennedy, Jr.
6/ 4/71
1,500
7,500
Dr. Gatlin
6/ 7/71
1,500
7,500
16,000
$80,000
Second 1971 Offering
James J. Biemer, M.D.
7/26/71
667
$ 5,000
Daniel J. Sprehe, M.D.
8/13/71
667
5,000
Ralph Jensen, M.D.
8/18/71
667
5,000
Walter E. Afield, M.D.
8/31/71
667
5,000
Wm. G. Taylor, M.D., P.A.,
Pension Plan
9/ 8/71
667
5,000
Arnold D. Levine
10/ 4/71
667
5,000
Fred J. Woods
10/14/71
667
5,000
John H. Boushall, Jr.
10/15/71
667
5,000
W. E. Sumner
10/18/71
667
5,000
Fred Curtis, Inc.
10/22/71
667
5,000
6,670
$50,000
*259 The first offering price of $5.00 per share was determined by the directors based on what they believed was a reasonable price for a speculative start-up venture in an uncharted field. The price of $7.50 per share in the second offering was similarly determined, but was set at a higher figure because Insurex was somewhat more mature and sounder than at the time of the first offering. In June 1971, Gary L. Raeckers and Frederick M. Taylor, Jr., were employed by Insurex as vice presidents. Prior to joining Insurex, Mr. Raeckers had been a radiology technician, and Mr. Taylor had recently graduated from college with a master's degree in economics. Mr. Raeckers and Mr. Taylor were placed in charge of opening new Insurex centers in the United States. Each of them was given an option to purchase 3,000 shares of Insurex stock each year for 5 years at a price of $5.00 per share. In December 1971, each of the founders gave 200 shares of Insurex stock to Mr. Raeckers and 200 shares to Mr. Taylor in appreciation of the work they were doing for Insurex and to make them more interested in the business. In addition, Mr. Guy gave each of them an additional 200 shares. In October 1971, *260 Mr. Smith, one of the founders, moved to Atlanta, Ga., as a result of a change in employment. He had borrowed, in the form of a short-term loan from his employer, the downpayment for the purchase of a home in Atlanta. Mr. Smith was unable to sell his house in Tampa and was compelled to sell 5,400 shares of his Insurex stock in order to repay the loan from his employer. In late 1971 and early 1972, he sold such stock at prices of $5.00 and $4.50 per share. In 1970, Insurex established its first office in Tampa. Thereafter, it attempted to open as many offices as it could in Florida, thereby saturating the Florida market for paramedical examinations and establishing its pre-eminence in that market before competitors entered the State. Also, it contemplated opening additional offices in other southern states and, thereafter, opening offices nationally. By the end of 1971, Insurex was performing, or was authorized to perform, paramedical physical examinations for 140 insurance companies and had 15 offices, which were located in Florida, Georgia, North Carolina, Virginia, and Maryland. There were no written contracts which required the insurance companies to use Insurex's services *261 or which prevented the insurance companies from using the services of other companies that provided paramedical examinations. By the beginning of 1972, Insurex was one of the largest "chain" providers of paramedical examinations in the United States. In opening offices as quickly as they did, the management and directors of Insurex sought to establish a national company by increasing revenues, the number of offices, and its geographic market, while sacrificing profits, cash flow, and working capital. Because of its expansion, its under-capitalization, and such management philosophy, Insurex was in constant need of additional funds. By early 1972, efforts to obtain additional funds from investment banking houses, venture capital concerns, and private investors, either through a public offering, venture capital, or as a loan, had proved fruitless. Insurex was too small and too unprofitable for a public offering, and the directors of Insurex felt that a favorable deal could not be obtained through a venture capital transaction. Also, the ability of Insurex to borrow additional funds was limited by the amount of its indebtedness, as well as a lack of profits. On February 24, 1972, Insurex's *262 bank line of credit was increased from $100,000 to $125,000, with each of the founders, except Mr. Smith, jointly and severally guaranteeing the increase in such line of credit. In April 1972, it was proposed by the board of directors of Insurex that Insurex and Plan Services, Inc. (PSI), a corporation then wholly owned by Mr. Guy and Mr. Murray, consolidate into a new corporation. Such a consolidation would allow Insurex to obtain the cash generated by PSI, a cash-producing company with a low demand for working capital. Mr. Guy and Mr. Murray considered PSI to be a source of funds for the expansion of Insurex. Also, they favored the consolidation because each company would enhance the value of the other and would create a larger entity that might more readily attract the attention of a potential buyer. Furthermore, it was hoped that the net operating loss carryforwards of Insurex could be used to offset the profits of PSI. At a meeting of the Insurex stockholders held on April 25, 1972, the proposed consolidation of Insurex and PSI was approved by a shareholder vote in excess of 80 percent (the legally required minimum). Yet, the consolidation failed because Mr. Guy and *263 Mr. Murray, acting for PSI, refused to waive a 100-percent voting requirement, since they wished to avoid litigation by those shareholders who wanted cash instead of stock in the consolidated corporation. Despite the failure of the proposed consolidation, Insurex was able to continue its operations, but there was a question as to whether it could continue to open offices on a national basis and, thereby, establish itself as a national company. Sometime after April 29, 1972, Insurex's bank line of credit was increased from $125,000 to $167,000. On August 21, 1972, such line of credit was increased to $200,000. The founders' guarantee was limited to $125,000. After the line of credit was increased to $200,000, Insurex pledged as collateral to the bank the life insurance policy on the life of Mr. Guy. In June 1972, Dr. Gatlin, then chairman of the board and medical director of Insurex, resigned from such office. He had dissented from the proposed consolidation of Insurex and PSI, and after June 1972, he completely disassociated himself from Insurex. He ws replaced as chairman of the board by Mr. Guy, who was then president of Insurex, and as medical director, by Dr. Sanders. *264 Mr. Raeckers succeeded Mr. Guy as president. After such changes, Mr. Raeckers' salary was set at $1,300 per month, the salaries of Mr. Taylor and Mr. Wilson were set at $1,000 per month, and the salary of Mr. Guy was reduced to $1,500 for May 1972 and to $750 per month thereafter. Also, the board of directors approved a move of Insurex's offices to smaller quarters. At a meeting of Insurex's board of directors held on July 31, 1972, a plan for reducing home office overhead to a "bare minimum" was discussed. In August 1972, the executive director of the Florida Board of Medical Examiners, in response to an inquiry by a Tampa physician, opined that the paramedic examinations described by that physician involved the illegal practice of medicine.As a result, Dr. Szakacs and Dr. Sanders resigned from the board of directors of Insurex and from the advisory positions they held with Insurex; but at that time both of them retained their Insurex stock. Before their resignations, Drs. Gatlin, Szakacs, and Sanders had provided Insurex with quality control over the examinations conducted by it. Thereafter, in January 1974, an informal opinion was issued by the Florida Attorney General to *265 the executive director of the State Board of Medical Examiners that paramedical examinations, such as those performed by Insurex, did not constitute the practice of medicine. In August 1972, the directors of Insurex adopted the "traveling-examination" concept and de-emphasized the practice of giving examinations at offices established by it. Thereafter, Insurex began actively implementing this fundamental change in the nature of its business. Insurex hired nurses to perform such examinations. Such nurses provided their own transportation and usually conducted the examinations at the office or home of the examinee. Insurex did not enter into formal employment contracts with such nurses, and they were paid a percentage of the examination fee. The overhead costs of sending out examiners in mobile units to perform paramedical examinations were substantially less than the costs of performing such examinations in fixed locations. In addition, in December 1972, Mr. Taylor left Insurex to work for a holding company, Guy, Murray, Smith, Inc. (GMS), [2] then owned by Mr. Guy and Mr. Murray in equal shares. Mr. Taylor left Insurex because, after the change to the traveling examination *266 concept, there was less need for his services. The directors of Insurex allowed him to retain his Insurex stock options to the extent of 4,500 shares, since he terminated his employment in order to benefit Insurex through the elimination of his salary. On October 31, 1973, Mr. Raeckers also left Insurex to work for an affiliated company of GMS. He was allowed by Insurex's directors to retain his stock option to the extent of 7,000 shares. Thereafter, Mr. Wilson replaced Mr. Raeckers as president of Insurex. As a result of the change to the use of mobile units and the reduction in supervisory personnel, Insurex's cash flow increased. In September 1972, the amount borrowed by Insurex under its bank line of credit reached $167,000. Thereafter, Insurex ceased borrowing additional funds from the bank. In May 1973, Insurex began making repayments to the bank and, by December 1975, had completely repaid such loan. In June 1973, Mr. Guy, in a memorandum to Mr. Raeckers and Mr. Wilson, stated the feeling of the directors of *267 Insurex that the company had expanded sufficiently to cover its overhead and that while they should continue to implement the traveling-examination concept, the major emphasis should be on profits. Thus, after June 1973, the corporate objective of Insurex changed from expansion to the generation of profits. In October 1973, the directors of Insurex authorized the sale of 13,500 shares of Insurex stock at a price of $10 per share to raise money for the payment of the bank loan, but such sale never took place. In March 1974, the directors approved the sale of up to 25,000 shares of Insurex stock at a price of $8 per share to raise money to repay the bank loan and to raise capital for expansion. Also, the directors discussed the possibility of taking Insurex public during 1975. In May 1974, efforts to follow through on such proposed sale were terminated. During the years 1971 through 1975, Insurex never failed to meet its obligations in the ordinary course of its business. During such years, the sales and profits or losses from operations of Insurex were as follows: Profits (Losses)
Year
Sales
Gross
[3] Per-Share 1971
$85,345
$ (87,302)
1972
323,268
(133,368)
$ (.37)
1973
533,742
59,765 .16 1974
568,272
63,324 .17 1975
495,307
30,121 .08 *268 In July 1975, the directors discussed the downturn in sales and profits which was occurring during 1975. The decrease in sales was attributed to the entry of competitors where there had been no competition. The directors discussed other markets and services that could be served or performed by Insurex in order to improve its income and profitability. As a result of such discussion, the directors terminated Mr. Guy's salary, which was then $400 per month, and authorized the payment of $1,000 per month to GMS for management services. The objective of such change was to implement a new plan of marketing of paramedical services in order to increase the overall sales of Insurex. Although the officers and directors of Insurex were closely connected with PSI and GMS, previously there was no formal contract with such companies to provide management services to Insurex. In June 1976, Mr. Guy dismissed Mr. Wilson because he was not performing his job satisfactorily. After he had disassociated himself from the management of Insurex in August 1972, Dr. Szakacs become increasingly concerned about his *269 liability for the bank line of credit which he and the other founders had jointly and severally guaranteed. His reason for such concern was that he felt he had lost contact with Insurex and the quality of the services offered by it. In August 1973, Mr. Murray, on behalf of GMS, offered to purchase from Dr. Szakacs 31,600 shares of Insurex stock at a price of 30 cents per share and to substitute PSI for Dr. Szakacs as guarantor on the bank line of credit. However, Mr. Murray advised Dr. Szakacs against such sale because Insurex had begun to make a profit and was making some payments in reduction of the outstanding balance on the line of credit. In September 1973, Dr. Szakacs took Mr. Murray's advice and declined the offer of GMS to purchase his Insurex stock. By January 1974, Mr. Smith had moved back to Tampa from Atlanta and had commenced employment with GMS. It was understood that he would acquire an interest in GMS, and subsequently, he acquired a 20-percent interest in such company. Prior to July 1974, Mr. Guy had been attempting to interest Dun and Bradstreet and other national companies in purchasing GMS and the businesses of its subsidiary and affiliated corporations, including *270 Insurex. In order to make GMS more attractive to a potential purchaser, Mr. Guy wanted to increase the consolidated earnings of GMS by transferring his, Mr. Murray's, and Mr. Smith's Insurex stock to GMS. It was his belief that, under equity accounting principles, GMS, provided it owned at least 20 percent of the outstanding stock of Insurex, could report a proportional part of the revenues and earnings of Insurex on the consolidated financial statements of GMS. Prior to July 1974, an oral offer was made on behalf of GMS to purchase the Insurex stock owned by Dr. Szakacs and Dr. Sanders at a price of $1 per share. In September 1974, Dr. Szakacs sold 23,600 shares of Insurex stock to GMS for a consideration of $1 per share. In addition, there was an oral agreement between him and Mr. Murray that Dr. Szakacs would be released from his individual liability as one of the guarantors of Insurex's line of credit with FNBT. After such sale, Dr. Szakacs retained 8,000 shares of Insurex stock. In September 1974, Dr. Sanders refused the offer of GMS to purchase his Insurex stock for $1 per share. In July 1974, Mr. Guy, Mr. Murray, and Mr. Smith each sold 20,000 shares of Insurex stock *271 to GMS at a price of $2 per share. Mr. Guy had contemplated selling his and Mr. Murray's Insurex stock to GMS at a price of $3 per share. However, Mr. Guy was advised by his attorney that if he and Mr. Murray sold their Insurex shares to GMS for $3 and if GMS paid $1 per share to non-GMS shareholders, the payment of $3 per share to them could result in dividend income to them (Mr. Smith had not yet become a shareholder of GMS). He was also told that the payment of such price to shareholders could result in a lawsuit by Dr. Szakacs and Dr. Sanders for loss of business opportunity. Accordingly, the price to Mr. Guy, Mr. Murray, and Mr. Smith was reduced to $2 per share; such price was also partially determined by the amount of cash then available in GMS. In August 1974, Mr. Guy sold an additional 15,000 of his shares in Insurex to GMS at a price of $1 per share; such price was partially determined by the amount of cash still available in GMS. After the acquisitions of the stock of Dr. Szakacs, Mr. Guy, Mr. Murray, and Mr. Smith, GMS owned 27.1 percent of the outstanding stock of Insurex. In November 1974, Mr. Winge sold 100 shares of Insurex stock at a price of $7.50 per share *272 to a supervisor in the Tampa insurance agency of Banker's Life of Nebraska; Mr. Winge was in charge of such agency. In December 1974, Mr. Wilson sold 75 shares of Insurex stock at a price of $7.50 per share to the office manager of Dr. Gatlin's medical practice. In November 1975, Life Insurance Consultants, Inc., a corporation wholly owned by Mr. Guy, sold 30,000 shares of Insurex stock to GMS at a price of 50 cents per share, thereby increasing the ownership of Insurex stock by GMS to 35 percent; such shares had been contributed by Mr. Guy to Life Insurance Consultants, Inc., in November 1972. In 1976, after Mr. Wilson was dismissed, GMS was willing to offer him 50 cents per share for his Insurex stock. During 1973, 1974, and 1975, Dr. Gatlin contributed Insurex stock to a qualified charity, and Dr. and Mrs. Gatlin claimed charitable deductions for such contributions on their joint Federal income tax returns for such years, as follows: Deduction Claimed
Date of Gift
Number of Shares
Price Per Share
Total
12/26/73
2,000
$7.50
$15,000
12/23/74
3,000
7.50
22,500
12/15/75
3,000
7.50
22,500
Although Dr. and Mrs. Gatlin claimed a deduction *273 for 1973 based on a gift of only 2,000 shares, Dr. Gatlin in fact gave 3,100 shares of Insurex stock to a qualified charity during that year, and they now claim an overpayment based on a charitable deduction in the amount of $23,250 for 1973. During 1973, 1974, and 1975, Mr. Winge contributed Insurex stock to various qualified charities, and Mr. and Mrs. Winge claimed charitable deductions for such contributions on their joint Federal income tax returns for such years as follows: Deduction Claimed
Date of Gift
Number of Shares
Price Per Share
Total
11/12/73
4,000
$7.50
$30,000
10/ 4/74
4,000
7.50
30,000
10/27/75
3,000
8.50
25,500
In his notices of deficiency, the Commissioner determined the fair market value of the Insurex stock contributed to charity by Dr. Gatlin and Mr. Winge was zero, and accordingly, disallowed such deductions. In the alternative, he determined that the petitioners were not entitled to the deductions claimed by them since they had not established that the fair market value of the Insurex stock contributed had a fair market value in excess of zero. Also, the Commissioner determined additions to tax for negligence *274 under section 6653(a) for each of the years in issue; however, he now concedes that the petitioners are not liable for such additions to tax. OPINION The issue for decision is the fair market value of the Insurex stock which Dr. Gatlin and Mr. Winge contributed to various qualified charities during 1973, 1974, and 1975. Section 170 allows a taxpayer who makes a charitable contribution a deduction, subject to certain limitations, in the year such contribution is made. If a charitable contribution is made in property other than money, the amount of such contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.; sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright,411 U.S. 546, 551 (1973); *275 Palmer v. Commissioner,62 T.C. 684, 69662 T.C. 684, 696 (1974), affd. 523 F. 2d 1308 (8th Cir. 1975). Where the property contributed is stock in a closely held corporation, such value is a pure question of fact. See Hicks v. United States,486 F. 2d 325, 328 (10th Cir. 1973); Hamm v. Commissioner,325 F. 2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 276 (1979). The parties, relying on the valuation reports of their respective expert witnesses, are in agreement that Insurex was a concept venture capital company. Such a company is a high-risk investment with a substantial upside potential. The value of such a company is based on its concept and its ability to translate that concept into growth in earnings and revenues, rather than on the basis of earnings stability or a predicted income stream. The parties also agree that, during the years in issue, Insurex most closely resembled the business operations and maturity of a venture capital company in third-stage financing. There are generally considered to be five different *276 stages of financing for venture capital companies: (1) startup; (2) first-stage financing; (3) second-stage financing; (4) third-stage financing; and (5) buy-out acquisition financing. See S. Rubel, "Venture Capital Investments," in I Financial Analyst's Handbook, ch. 18, p. 499 (S. Levine ed. 1975).Third-stage financing involves companies in which sales volume has increased to where the company is breaking even or making a profit and where funds are needed for further expansion. However, at this point, the parties part company. The petitioners argue that so long as Insurex continued to expand and did not falter on its expansion path, the best indication of the value of its stock is the price established by the second 1971 offering, $7.50 per share. Such value, they contend, represented the arm's length price placed on the value of the concept and should be given controlling weight in determining the fair market value of Insurex stock during 1973 and 1974. However, because of the decline in revenue during 1975, both in actual dollars and in relation to projected earnings, [4] the petitioners recognize there was a reduction in the fair market value of the Insurex stock. Accordingly, *277 they contend that during 1975, the fair market value of such stock was $4.69 per share. The Commissioner, on the other hand, argues that after 1972, the prospects for Insurex had declined significantly and that therefore the 1971 sales are not controlling in determining the fair market value of Insurex stock during the years in issue. The Commissioner determined such value by ascertaining the price-earnings multiples for other venture capital companies which had gone public during the years in issue and by using the average of such multiples to capitalize the earnings of Insurex. He discounted the value so obtained by 30 percent because of the lack of marketability of Insurex stock. Based on such analysis, the Commissioner's expert witness determined that the fair market value of Insurex stock was 80 cents in 1973, 54 cents in 1974, and 49 cents in 1975. In our view, the valuation approach taken by the Commissioner, in reliance on his expert witness, is inherently flawed. The valuation *278 approach of such expert sought to compare the earnings record of Insurex with that of other companies which had gone public during the years in issue. For an established company, such approach may be valid, provided suitable comparables can be found. See Righter v. United States,194 Ct. Cl. 400, 439 F. 2d 1204 (1971); Central Trust Co. v. United States,158 Ct. Cl. 504, 305 F. 2d 393 (1962); Zaiger v. Commissioner,64 T.C. 927 (1975)[5]; see also 10 Mertens, Law of Federal Income Taxation, sec. 59.23 (Doheny Rev. 1976). However, here the Commissioner's expert found that there were no firms having publicly traded stock which were in the same business as Insurex, nor were there comparable publicly held firms that performed paramedical services.In the absence of comparable companies, such expert relied on the price-earnings multiples applied to a sampling of venture capital companies which had gone public during 1973 through 1975. Yet, from the brief description of such companies, we have no means of determining their comparability. Moreover, *279 and more importantly, such companies were most likely in a later stage of development and maturity than Insurex; thus, they could be valued on the ability to generate earnings rather than on the value of their concepts.During the years in issue, Insurex had been in existence only a few years, was, prior to August 1973, sacrificing earnings to penetrate the market and establish its market position, and was just beginning to earn a profit. In such circumstances, valuation based on capitalization of earnings is not reliable. Duncan Industries, Inc. v. Commissioner,73 T.C. at 280 n. 13. Hence, we reject the Commissioner's valuation method as being unreliable. See Helvering v.National Grocery Co.,304 U.S. 282, 295 (1938). We also are not convinced that the petitioners' method properly reflected the fair market value of the Insurex stock on the dates of the contributions. Their approach is based on the established premise that, in valuing unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business and *280 within a reasonable time before or after the valuation date, are the best criteria of market value. See Fitts' Estate v. Commissioner,237 F. 2d 729, 731 (8th Cir. 1956), affg. a Memorandum Opinion of this Court; Duncan Industries, Inc. v. Commissioner,73 T.C. at 276; Messing v. Commissioner,48 T.C. 502, 509 (1967). It is clear, and the Commissioner does not seriously contend otherwise, that the sales of Insurex stock in the second 1971 offering were made in the ordinary course of Insurex's business and were at arm's length. However, common sense dictates that the price established by such sales would continue to be a valid measure of fair market value only if an investor's perception of Insurex was the same during the years in issue as it was during 1971. The record shows that a potential investor, having reasonable knowledge of all relevant facts, would have changed his perception of Insurex. In 1971, Insurex was essentially a novel concept, and an investor would have determined the value of its stock based on the worth of such concept, not on its net worth or on its actual revenues and earnings. At that time, there were *281 a few companies providing paramedical examinations for the insurance industry, but there were only a few competitors in the national market and, apparently, none in the Florida market. In addition, the paramedical examination had begun to gain acceptance by the life insurance companies, and the demographics of the life insurance industry indicated that there could be a substantial demand for Insurex's services. Thus, although Insurex was just a fledgling company, there were reasonable prospects for it to achieve its goal of a national presence and, correspondingly, a substantial increase in the value of the stock. However, after the failure of the proposed consolidation with PSI in 1972, Insurex's corporate goal of achieving a national presence had dimmed. During 1972, Insurex, due to its undercapitalization, was experiencing continuing difficulties with its cash flow, and that shortage substantially hindered its planned expansion. After the failure of the proposed consolidation, it is clear that the measures taken by the management of Insurex enabled it to survive its liquidity crisis and generate considerable improvement in its cash flow, revenues, and earnings, as well as *282 enabling it to repay its indebtedness. However, the company that emerged was significantly different from the one envisioned in 1971. The principal measure taken by the management of Insurex was the conversion from fixed to traveling examinations. Such measure eliminated the overhead associated with the fixed locations and enabled Insurex to eliminate some of its home office personnel. However, such changes reduced the depth of Insurex's management. In addition, the same changes that resulted in the reduction in Insurex's overhead also showed that others could enter into the business of furnishing paramedical examinations without a large amount of capital. In fact, the directors of Insurex attributed the reduction in earnings for 1975 to increased competition. Furthermore, although the revenues and earnings continued to increase, their growth was beginning to flatten out by 1974. Such fact is particularly telling, since in June 1973, Insurex had altered its primary corporate goal from expansion to the generation of profits. The failure of Insurex to implement successfully its goal of expansion would have caused an investor to question Insurex's growth potential. Thus, while *283 it is clear that after 1972 Insurex could, and most likely would, survive, its ability to obtain a national presence had faltered or, at best, was considerably postponed. Accordingly, we believe that an investor would have concluded that it would be necessary to hold his Insurex stock for an extended period before a satisfactory return could be achieved, and that therefore, the fair market value of Insurex stock was considerably less than $7.50 per share on the dates of the contributions. See Buffalo Tool & DieMfg. Co. v. Commissioner,74 T.C. 441, 450-451 (1980). Our doubt about the petitioners' valuation method is reinforced by an examination of the actual sales and offers to sell Insurex stock in 1973 through 1976. The parties agree that the sales of the small blocks of Insurex stock in November and December 1974 at $7.50 per share are not indicative of the fair market value of the stock at that time. Thus, the only other possible indicators of fair market value are the offer to Dr. Szakacs in August 1973, the offer to Dr. Szakacs and Dr. Sanders in 1974, the sale by Messrs. Guy, Murray, and Smith to GMS in July 1974, the sale by Mr. Guy to GMS in August *284 1974, the sale by Dr. Szakacs in September 1974, the sale by Mr. Guy's wholly owned company, Life Insurance Consultants, Inc., in November 1975, and the offer to purchase Mr. Wilson's shares in 1976. None of such sales satisfies the definition of an arm's length sale between a willing buyer and a willing seller. Also, the offers to purchase are not necessarily determinative of fair market value. See 10 Mertens, supra, sec. 59.17. Yet, in the aggregate, such transactions constitute the sale of or offer to purchase a large number of shares of Insurex stock, and by analyzing each transaction and taking into consideration the peculiar circumstances surrounding it, we can find some reliable indication of the fair market value of the Insurex stock at those times. In July 1974, GMS purchased 60,000 shares of Insurex stock from Messrs. Guy, Murray, and Smith at a price of $2 per share. There is some evidence that Mr. Guy considered the stock to be worth more than that price and accepted that price to avoid any claim that GMS was in effect distributing dividends to its shareholders. On the contrary, GMS wished to acquire Insurex stock to improve its consolidated financial statement *285 and hence may have been willing to pay a premium for such stock. In addition, there were the sales by Mr. Guy of 15,000 shares at $1 per share in 1974 and the sale by his wholly owned corporation of 30,000 shares at 50 cents per share in 1975. In the case of those sales, there is no reason to believe that Mr. Guy would have sold so many shares at a bargain since the other shareholders of GMS were not making similar sales to that corporation, and the record contains no other evidence indicating that such sales were made at a bargain price. With respect to the sale by Dr. Szakacs, it appears that such sale was primarily motivated by his desire to be released from his guarantee of the line of credit with the bank, since he only sold the number of shares necessary to obtain such release. The petitioners argue that in addition to the $1 per share he received for such stock, we should find that Dr. Szakacs received additional consideration of $125,000, the full amount of the guarantee. However, such argument ignores the fact that Dr. Szakacs was only one of 7 guarantors who were jointly and severally liable under the guarantee and that all of such guarantors were men of substantial *286 means. Also, in August 1974, the outstanding balance of the line of credit was less than $125,000, and Insurex had begun to make a profit and was making regular payments in reduction of such indebtedness. Thus, it was doubtful that the loan would go into default or that Dr. Szakacs would be called upon to pay more than his pro rata share if it did. Furthermore, the fact that GMS had offered to purchase Dr. Sander's shares at $1 per share indicates that GMS did not attach much, if any, value to Mr. Murray's agreement to release Dr. Szakacs from his guarantee. However, the fact that in September 1974, Dr. Sanders refused the offer of GMS to purchase his stock at $1 per share may indicate that the stock was worth more than that price. See Trianon Hotel Co. v. Commissioner,30 T.C. 156, 181 (1958). On balance, the sale by Dr. Szakacs indicates to us that he may be considered to have received something more than the $1 per share, but only a little more. In determining the fair market value of Insurex stock, we believe that such value was not materially different in 1973 than in 1974. While revenues and earnings had improved somewhat in 1974, this change would *287 have been expected as a result of the change in Insurex's corporate policy in 1973. However, the decline in sales and sharp decline in profits during 1975 would have caused a substantial weakening of investor confidence in Insurex, particularly after the relatively modest, 6 percent, increase in earnings and profits between 1973 and 1974. Inexactitude is a byproduct when we are asked to value property which has no established market value.However, since we must make a determination of such value, we have carefully examined the entire record and weighed the evidence. By exercising our best judgment, we find and hold that the fair market value of Insurex stock was $2 per share during 1973 and 1974 and $1 per share during 1975.
At trial, the petitioners made a motion to shift the burden of proof in this case or, in the alternative, to shift the burden of going forward with the evidence or to invalidate the presumption of correctness which normally attaches to a notice of deficiency. See Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). They contend that the Commissioner's determination was, per se, arbitrary, excessive, *288 and without a rational basis or factual foundation. Therefore, they argue that we should invoke the doctrine of Helveringv. Taylor,293 U.S. 507 (1935), and shift the burden of proof or the burden of going forward with the evidence to the Commissioner. When a petitioner asks the Court to find that a deficiency notice is arbitrary, excessive, and without a rational basis or foundation, he is asking that we look behind the notice to examine the evidence used by the Commissioner or the propriety of his motives or administrative policies or procedures in making the determination reflected in the notice. As a general rule, we will not honor such a request. Crowther v. Commissioner,269 F. 2d 292, 293 (9th Cir. 1959), affg. on this issue 28 T.C. 1293 (1957); Greenberg's Express, Inc. v.Commissioner,62 T.C. 324, 327-329 (1974); HumanEngineering Institute v. Commissioner,61 T.C. 61, 66 (1973); Figueiredo v. Commissioner,54 T.C. 1508, 1513 (1970), affd. per order (9th Cir. *289 , March 14, 1973). The rationale for such rule is that a trial before this Court is a proceeding de novo, and our decision is based on the merits of the case rather than on any previous record developed at the administrative level. Conforte v. Commissioner,74 T.C. 1160, 1177 (1980); Jackson v. Commissioner,73 T.C. 394, 400 (1979); Greenberg's Express, Inc. v. Commissioner,62 T.C. at 328. An exception to such rule has been applied in cases involving unreported income from illegal activities where, recognizing that the petitioner must prove a negative, the courts have required the Commissioner to go forward with evidence linking the petitioner to such activity. See, e.g., Llorente v. Commissioner,649 F. 2d 152 2d Cir. 1981), revg. in part 74 T.C. 260 (1980); Weimerskirch v. Commissioner,596 F. 2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Carson v. United States,560 F. 2d 693 (5th Cir. 1977); Gerardo v. Commissioner,552 F. 2d 549 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Opinion of this Court; Jackson v. Commissioner,supra; *290 see also United States v. Janis,428 U.S. 433 (1976); Suarez v. Commissioner,58 T.C. 792 (1972). In no case has such exception been applied to the disallowance of a claimed deduction. See Greenberg's Express v. Commissioner,supra at 330; Karme v. Commissioner,673 F. 2d 1062 (9th Cir. 1982), affg. 73 T.C. 1163 (1980). Moreover, this is not a case where the petitioners must prove a negative, or where they are charged with reprehensible conduct, or where the Commissioner has allegedly acted in violation of the constitutional rights of the petitioners. See United States v. Janis,supra;Weimerskirch v. Commissioner,596 F. 2d at 361-362. Rather, the issue for decision is purely one of fact--the fair market value of the Insurex stock. Here, both parties have come forward with evidence to establish such value, and based on such evidence, rather than in reliance on the burden of proof, we have made an objective determination of such value. Accordingly, we will deny the petitioners' motion. Orders denying petitioners' motion will be issued.
*291 Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. GMS owned 100 percent of PSI, as well as interests in several other corporations. Plan Services International, Inc., was the predecessor of GMS.↩
3. During the period 1972 through 1975, there were 364,270 shares outstanding.↩
4. The petitioners' expert witness projected that revenues for 1975 should have been $792,470.50. Therefore, the actual revenues of $495,307.00 resulted in a shortfall of 37.5 percent.↩
5. See Estate of Clarke v. Commissioner,T.C. Memo. 1976-328↩.